Robert C. McMULLEN,
Plaintiff-Appellant,

v.

Dale CARSON, Individually and as Sheriff of the City of Jacksonville, Fla., and City of Jacksonville, Fla., Defendants-Appellees.

No. 83-3579.

United States Court of Appeals,
Eleventh Circuit.

March 8, 1985.

Samuel S. Jacobson, Warren K. Anderson, Jr., Jacksonville, Fla., for plaintiff-appellant.

Robert G. Alexander and Michael B. Wedner, Jacksonville, Fla., for defendants-appellees.

Before RONEY and CLARK, Circuit Judges, and MOORE *, District Judge.

RONEY, Circuit Judge:

Robert C. McMullen brought a 42 U.S.C.A. § 1983 suit against Dale Carson, individually and in his position as Sheriff of the City of Jacksonville, Florida, and against the City of Jacksonville, Florida. McMullen, a clerical employee in the Sheriff's office, was fired after he was interviewed on a locally televised news broadcast as a

* Honorable John H. Moore, II, U.S. District Judge for the Middle District of Florida, sitting   by designation.

recruiter for the Ku Klux Klan. The district court, 568 F.Supp. 937, dismissed the action after making detailed findings concerning the perceived violent nature of the Klan, and of the serious racial tension which McMullen's television appearance and employment in the Sheriff's office created between the black community and the Sheriff's office in the City of Jacksonville. Plaintiff claims his dismissal violated his fundamental First Amendment rights of speech and political expression. We affirm the judgment for defendants on the district court's finding that plaintiff's discharge was necessary to prevent a deleterious effect on the Sheriff's ability to enforce the law in the community.

Most of the facts are not really in dispute so the issue on appeal is whether the Sheriff could fire plaintiff without violating his constitutional rights. Plaintiff was hired as a temporary full-time clerk in the records section of Duval County's Sheriff's Office in October 1981. His duties involved the filing of both public and confidential records. He also fingerprinted persons seeking employment and registered firearms. Plaintiff performed his duties in exemplary fashion. He was courteous, conscientious, and got along well with his fellow records section employees. He was largely unsupervised during the working day.

Plaintiff had obtained an application form to join the Invisible Empire of the Knights of the Ku Klux Klan in September 1981. He completed and mailed in the application about the same time he started working at the Sheriff's office. By January 1982 plaintiff had become a Klan recruiter. He recruited on his own time by distributing Klan literature in various public areas.

Shortly after vandals left a cross in the yard of a Jacksonville black woman's home, plaintiff and Bill Wilkinson, "Imperial Wizard" of the Invisible Empire, the Klan faction to which plaintiff belonged, held a news conference disclaiming Klan involvement in the vandalism. Plaintiff identified himself as a Klan recruiter and as a Sheriff's office employee. The interview was broadcast on the evening news before an estimated audience of 117,000 to 182,000 adult viewers. Both television and newspaper media followed up on plaintiff's status as a Klan recruiter in the Sheriff's office.

Instant and strongly negative reactions in the black community resulted from the initial reports of plaintiff's Klan activities. The Jacksonville Urban League reported approximately 200 telephone calls and live comments from individuals concerned about the existence of a Klansman in the Sheriff's office. Many comments reflected the notion that Jacksonville blacks should resist arrest by Sheriff's personnel for fear of their lives.

Sheriff Carson learned of plaintiff's activities from this media coverage. Fearing for his department's ability to effectively perform its duties, Carson dismissed plaintiff immediately. Carson testified he thought retaining plaintiff would lead to serious morale problems in his department and would interfere with its affirmative action plan.

Ten days after he was fired, plaintiff, his wife, Bill Wilkinson, and three others marched to the Duval County Courthouse in their hoods and robes to protest plaintiff's dismissal. Despite NAACP and local religious leaders' admonitions to stay away, a crowd of two to three hundred people attended the rally. Angry anti-Klan sentiments were shouted and some minor violence broke out, but it was quickly subdued by the police.

Based on Mr. Wilkinson's decision to exploit recent racial tensions in Miami for Klan purposes, plaintiff decided the Klan was too confrontational for him. He resigned from the Klan in late 1982 or early 1983.

This action was brought seeking plaintiff's reinstatement as a Sheriff's office employee and an award of damages from Sheriff Carson and the City. By stipulation no damages will be sought individually from Sheriff Carson. Plaintiff has moved from Jacksonville since this action was filed. There is no evidence in the record

suggesting he plans to return to Jacksonville, and he indicated he would be unable to return to the Sheriff's office were this Court to conclude he was so entitled.

The fundamental question here is whether plaintiff can be fired for his Klan beliefs and activities just because of the violent public reaction to his employment in the Sheriff's department. There seems to be little question that it was this reaction in the community, not plaintiff's activities alone, which caused his dismissal.

■ Although at-will Government employees may be fired with or without reason, they may not be fired for exercising their constitutional rights. *Branti v. Finkel,* 445 U.S. 507, 514–16, 100 S.Ct. 1287, 1292–93, 63 L.Ed.2d 574 (1980). The district court made numerous findings of fact regarding the nature of the Klan and plaintiff's relationship to it. In reviewing findings of fact in First Amendment cases, this Court must make an "independent examination of the whole record," rather than relying solely on the "clearly erroneous" standard. *Bose Corp. v. Consumers Union,* — U.S. —, —, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502, 515 (1984); *New York Times v. Sullivan,* 376 U.S. 254, 284–86, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964). Based on that review and an analysis of the applicable law, it is clear that the district court's decision for defendants must be affirmed.

Two critical factors surface in this case: the first involves what this record shows as to the nature, both actual and perceived, of the Klan as a violent, criminal, and racist organization dedicated to the sowing of fear and mistrust between white and black Americans. Defendants produced numerous witnesses at trial to support the necessity of Sheriff Carson's decision. None of this evidence was contested. From this testimony the district court found that although the Invisible Empire is just one of various Klan organizations in the country, the public makes no distinction in its perception of the Klan as a monolithic entity composed of a "small group of violent extremists who are imbued with fanatic dedi-

cation to racist ideas." The perception exists widely throughout the country, as well as in Jacksonville.

There is uncontradicted evidence that violent racism has become the Klan's hallmark and has not subsided to any appreciable extent since the Klan's founding shortly after the Civil War. Divisive, confrontational tactics are used by the Klan during periods of racial unrest in order to promote recruitment. Those tactics are still being used in Florida. Plaintiff himself testified that he eventually resigned from the Invisible Empire due to their confrontational manner, and has been unable to find a non-confrontational Klan chapter to join since his resignation. The finding of these facts is supported by the record.

■ The second critical factor here is that plaintiff was employed by a law enforcement agency, the members of which are subject to greater First Amendment restraints than most other citizens. *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1978). Jacksonville's black community has had severely strained relations with the Sheriff's office. Many blacks believe relations with the Sheriff's office are better now than in previous years. Despite a residual basic distrust, many think relations are improving even more. The district court's finding that plaintiff's retention would severely impede the progress made in nurturing trust between blacks and the Sheriff's office is supported by the record.

A balancing test must be used in cases involving public employees and First Amendment rights. The problem in any case is to arrive at a balance between

> [t]he interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983),

the Court saw this *"Pickering* balance" as requiring "full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." 461 U.S. at 150, 103 S.Ct. at 1692, 75 L.Ed.2d at 722.

Here, the Government's responsibilities to the public are manifest. The Sheriff's office is charged with securing the safety of persons and property, and enforcing the law. Under our system of Government, that duty can be performed effectively only with the consent of the vast majority of those citizens policed by the Sheriff's office. Efficient law enforcement requires mutual respect, trust, and support.

The evidence is uncontradicted that Jacksonville's black community in large part would categorically distrust the Sheriff's office if a known Klan member were permitted to stay on in any position. The fact that plaintiff would not individually make arrests was seen as irrelevant by Jacksonville blacks. Sheriff Carson could thus not have just transferred plaintiff to another department, and he had no authority to offer any other type of city employment. Those facts allowed Sheriff Carson no less restrictive means of dealing with the problem plaintiff presented. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Furthermore, the very esprit de corps of the employees and officers of the Sheriff's office was at stake. The record shows that even plaintiff's fellow record office clerks, with whom he got along well, were glad to see him go once he became known as a Klansman. They knew serious conflict was inevitable considering the number of blacks working in the same records section.

■ On the other side of the balancing test lie plaintiff's constitutional rights to free speech and political expression. Plaintiff correctly points out that mere membership in an organization without specific advocacy of any illegal conduct of the organization is constitutionally protected. *United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *Elfbrant v. Russell,* 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966). Yet plaintiff cannot rely on that constitutional "safe harbor" here. He was not a passive member. Much of his spare time was spent aggressively recruiting new members for the Klan. Although he testified at trial that he was not certain of what he was getting into when he joined the Klan, the trial judge found him unpersuasive and the record supports such a finding.

■ Plaintiff suggests Sheriff Carson acted too swiftly, that actual public perceptions should have been tested before taking any action. Carson responded that based on his 27 years experience with the Jacksonville Sheriff's Office, he knew all too well what the reaction would be. It would be immediate and highly adverse to his department's operation.

There was no reason for Carson to wait in this type of situation. The Supreme Court has held there is no

> necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.

*Connick,* 461 U.S. at 152, 103 S.Ct. at 1692, 75 L.Ed.2d at 723. *Connick* cautioned that "a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." 461 U.S. at 152, 103 S.Ct. at 1692, 75 L.Ed.2d at 723. Such a showing has been made here. Sheriff Carson was faced with an explosive racial situation in a city already marked by poor relations between a sizeable black minority and the city's most important law enforcement agency. Without an immediate response, serious conflict was almost certain to occur.

The Supreme Court has recognized that law enforcement agencies are qualitatively different from other Government branches. *Kelley v. Johnson,* 425 U.S. 238, 245–46, 96 S.Ct. 1440, 1444–45, 47 L.Ed.2d 708 (1978). *See also Waters v. Chaffin,* 684 F.2d 833, 839 n. 12 (11th Cir.1982); *Leonard v. City of Columbus,* 705 F.2d 1299 (11th Cir. 1983). The First Amendment does not pro-

tect personal behavior in the law enforcement context to the same extent that it does in other areas of Governmental concern. The need for high morale and internal discipline in a police force led this Court to hold that "a reasonable likelihood of harm generally is ... enough to support full consideration of the police department's asserted interests in restricting its employees' speech." *Waters*, 684 F.2d at 839 n. 12.

Based on an independent and complete review of the record, we hold that the trial court was correct in finding that balancing the rights of the parties required a decision for defendants. The rights plaintiff seeks to exercise are important. We recognize the dangerousness of any principle conditioning employment upon a person's beliefs or association with a constitutionally protected organization. The reaction of the community to such racist views notwithstanding, plaintiff has a constitutionally protected right to express them. The reaction of a community cannot always dictate constitutional protections to employees. We hold only that a law enforcement agency does not violate the First Amendment by discharging an employee whose active participation in an organization with a history of violent activity, which is antithetical to enforcement of the laws by state officers, has become known to the public and created an understandably adverse public reaction that seriously and dangerously threatens to cripple the ability of the law enforcement agency to perform effectively its public duties.

The district court did not err in entering judgment for the defendants.

AFFIRMED.