602 A.2d 712

**Donald H. HAWKINS**

v.

**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES.**

**No. 63, Sept. Term, 1991.**

Court of Appeals of Maryland.

March 10, 1992.

Anthony V. Teelucksingh (Whiteford, Taylor & Preston, Susan Goering, American Civil Liberties Union of Maryland, all on brief), Baltimore, for appellant.

Alan D. Eason, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Carmen M. Shepard, Asst. Atty. Gen., all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

This case has been presented as one involving freedom of speech by a public employee. The question is whether a prison guard may be discharged, during the probationary employment period, based in substantial part on the guard's abusive words and conduct directed toward a private citizen, while the guard was off duty, away from the prison, and out of uniform. The facts are straightforward; the procedural history is tangled; and directly applicable, controlling law appears to be sparse, if not nonexistent.

Appellant, Donald H. Hawkins (Hawkins), was employed on February 26, 1985, by the Division of Correction, Department of Public Safety and Correctional Services of the State of Maryland, as a probationary correctional officer at the House of Correction. Approximately twenty years earlier Hawkins had worked at the House of Correction for about one and one-half years, and he had worked for five years as a guard at the Anne Arundel County Detention Center.

On November 27, 1985, Hawkins, in mufti, presented his State of Maryland payroll check for cashing to Ms. Hanaa Elabd (Elabd), a teller at the Maryland National Bank branch office on West Street in Annapolis. The check was drawn on First National Bank, and Hawkins had no account

with Maryland National Bank. Over the preceding nine months, however, Hawkins had been cashing his payroll checks at the West Street branch of Maryland National, an arrangement made possible by Hawkins's acquaintanceship with the person who previously had been manager of that branch.

On the occasion in question the teller, Elabd, advised Hawkins that Maryland National would not cash the check, and she directed him to the nearest branch of First National Bank. Hawkins began arguing and requested to see the branch manager. The manager was not on the premises at the time, but Elabd explained that she, as head teller, was in charge. Hawkins left the tellers' counter and spoke to a service representative who, after a lengthy discussion, authorized cashing the payroll check. In this discussion Hawkins exhibited a document identifying himself as a correctional officer at the House of Correction.

What thereafter transpired is described in a letter of December 10, 1985, written by the bank's branch manager to the Warden, Maryland House of Correction.

"Mr. Hawkins returned to Mrs. Elabd's window and passed a smug remark about his going over her head. Without incident, Mrs. Elabd cashed his check and gave him the money. He then walked away about 20' and loudly proclaimed 'Hitler should have gotten rid of all you Jews'. Mrs. Elabd looked surprised and motioned to the teller next to her that she was not Jewish. Mr. Hawkins was watching her reaction, then continued, 'and all the Poles too'. The teller's response was 'She's not ignorant either'. With that said, he turned and left the bank. There were several other customers and Maryland National Bank employees who witnessed this scene."

Shortly after this incident occurred, an official of the State of Maryland Department of Natural Resources who happened to come into the bank was told what had occurred. That official telephoned the House of Correction and reported the incident to Larry B. Anderson (Anderson), the personnel officer at the penal institution. Two or three

hours after the incident, Anderson telephoned the bank and spoke both to the manager and to Elabd, who was still upset and crying during the telephone conversation. In that conversation Anderson learned that Elabd is Egyptian. Subsequently, the bank manager confirmed the facts of the incident by the letter, above quoted.

On December 18, 1985, Hawkins was called before the warden who reviewed the information received concerning the incident at the bank. Hawkins denied making the statements attributed to him. The warden also apparently reviewed other deficiencies in Hawkins's record, including failures to appear for work. At this meeting the warden rejected Hawkins from probation, *i.e.*, terminated his employment.[1]

Hawkins appealed to the Secretary of Personnel (the Secretary), contending that his first amendment rights were infringed by the rejection.[2] At an evidentiary hearing before a hearing officer Anderson and Hawkins testified. Anderson explained how correctional officers are on the "front line" in handling inmates, in observing their conduct, in maintaining order, in controlling their movement, and in intervening in disputes between inmates. The job is "a very stressful one under the best of circumstances." Inmates are constantly shouting provocative remarks at the

---

1. In this case the State does not deny that Hawkins's conduct in the bank was a "'substantial factor'" or "'motivating'" factor of the State's decision to fire Hawkins. *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471, 484 (1977). Nor does the State argue that it would have reached the same decision even in the absence of Hawkins's conduct at the bank, under the rule of *Mt. Healthy*. Consequently, we will not concern ourselves further in this opinion with other alleged deficiencies in Hawkins's performance as a probationary correctional officer.

2. During the probationary period probationary new employees may be discharged "without reason and without cause." *Small v. Secretary of Personnel*, 267 Md. 532, 535, 298 A.2d 173, 174 (1973). The inquiry before the Secretary is limited to the "legality" of the rejection, and the Secretary "is precluded from considering whether or not legitimate management prerogatives were properly exercised." 60 Op. Att'y Gen. 545, 550 (1975).

correctional officers. The House of Correction has "a large black population, as well as white population of inmates and a variety of other racial, ethnic, and religious groups." In Anderson's opinion "the actions that Mr. Hawkins displayed in the bank in acting out what was apparently prejudice on his part is exactly the kind of behavior that has the potential to escalate the tensions inside of the institution rather than to produce the calming effect that's desired."

Hawkins denied making the statements. He said, "I don't know where they got this. I mean anybody looking can tell when they are a Jew." He further testified, "I don't believe how anybody can say this because I believe that Jews are God's chosen people."

The hearing officer accepted the version of the incident described in the bank manager's letter.

Hawkins filed exceptions with the Secretary. The Secretary's designee concluded that "[t]he evidence in the record clearly indicated that Mr. Hawkins' remarks on November 27, 1985, to the bank teller were mere personal abuse." The Secretary's designee could "not reasonably conclude that Mr. Hawkins' abusive remarks directly to Ms. Elabd fall under the shield of the first amendment." Inasmuch as the remarks were "unprotected under the first amendment" Hawkins's rejection from employment was not for an illegal reason and, therefore, was effective.

Hawkins appealed to the Circuit Court for Baltimore City where the matter was heard by Judge Marvin B. Steinberg. Judge Steinberg determined that Hawkins's remarks were not of public concern, but that this would not deny Hawkins protection from termination under the first amendment. The court referred to the test laid down in *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811, 817 (1968), of arriving "at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Judge

Steinberg viewed this balancing test to be applicable, as well, to comments upon matters which were not of public concern, including comments directed solely to individuals. The circuit court accordingly ordered this case remanded to the Secretary in order to make findings of fact concerning whether Hawkins's "comments adversely affected the State's ability to perform its functions."

At a second administrative hearing held in August of 1989 the State produced as its witness Gary Hornbaker (Hornbaker), the Director of Security for the Division of Correction. In his fifteen year career in correctional services, Hornbaker had spent nine years at the House of Correction, rising from correctional officer I to captain. Thereafter, he has served on the staff of the Secretary of the Department of Public Safety and Correctional Services. He reviews approximately 800 to 1,000 "serious incident" reports per year from throughout the Maryland correctional system. As Director of Security he has reviewed a total of twenty to twenty-five reports involving inmate assaults on a correctional officer where the inmate alleged that the reason for the assault was name calling or use of a racial epithet directed by the correctional officer at the inmate.

In Hornbaker's opinion it was appropriate not to continue Hawkins on duty as a correctional officer. Hornbaker explained:

"Well the setting [in] which the [bank] incident occurred was not a very stressful or intense situation as you would encounter in an institution. For that type of action to occur in that [bank] setting would lead me to believe that it could occur in a more stressful or tense situation in an institution, and, as such, I could not allow that individual to continue working, knowing that I have an individual who could potentially spark a major disturbance by his statements."

When asked whether the warden should not have waited to see if something similar happened in the institutional setting, Hornbaker replied:

"No. There are too many people whose safety is at stake, the inmates and the other staff, to wait. It is not—it wouldn't be one of the situations where you wait and see if something may occur.

"[O]ne of the responsibilities is to prevent situations from occurring, not to wait until they occur."

The hearing officer proposed the following finding of fact which the Secretary adopted:

"Correctional officers are required to work with inmates of all races, creeds and color and they must show respect for individuals regardless of race or ethnic heritage. Failure to respect an inmate's race, creed, and color has led, and is likely to continue to lead, to internal disruption or other operational interferences."

The hearing officer recognized that the evidence did not support finding that Hawkins's remarks "did in fact have an adverse effect upon the operation of [the Division of Correction]," but the hearing officer proposed, and the Secretary found, that had Hawkins's remarks "been known within the correctional setting, Mr. Hawkins's comments were '... likely to adversely affect the operation of the correctional system and the performance by the Plaintiff of his job.'"

In conclusion the Secretary found, based on the proposed findings submitted, as follows:

"Clearly, Mr. Hawkins's behavior runs the risk of disrupting the internal operation of the correctional institution. It naturally follows that if the [Division of Correction] lacks confidence in Mr. Hawkins's ability to perform as expected, it cannot promote '... the efficiency of the public services it performs through such employees.'"

Hawkins again appealed to the Circuit Court for Baltimore City, where the matter was heard by Judge John Themelis, who affirmed the Secretary. Judge Themelis essentially held that the Secretary's determination was supported by competent evidence and that the conduct at the

bank was rationally related to potential disruption of the employer's operations.

Hawkins appealed to the Court of Special Appeals. Prior to consideration of the matter by the intermediate appellate court, we issued the writ of certiorari on our own motion.

## I

There are three decisions of the United States Supreme Court which principally bear on the issue before us, *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). This case does not fully fit within the fact pattern of any of the three principal cases.

*Pickering* involved a school teacher who was dismissed from his job because, while a proposed increase in the school district tax rate was pending voter approval, he had written a letter to the editor of the local newspaper attacking the allocation of financial resources by the school board between educational and athletic programs. The Court, speaking through Justice Marshall, articulated the balancing test quoted above. The Court observed that the criticisms by the teacher "cannot reasonably be regarded as *per se* detrimental to the district's schools," 391 U.S. at 571, 88 S.Ct. at 1736; nor would claims of an undesirable emphasis on athletic programs normally impact on the actual operation of the schools. *Id.* The Court, citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), recalled that

"[t]he public interest in having free and unhindered debate on matters of public importance—the core value of the Free Speech Clause of the First Amendment—is so great that it has been held that a State cannot authorize the recovery of damages by a public official for defamatory statements directed at him except when such statements are shown to have been made either with knowl-

edge of their falsity or with reckless disregard for their truth or falsity."

391 U.S. at 573, 88 S.Ct. at 1737. The Court held "that, in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 574, 88 S.Ct. at 1738 (footnote omitted).

*Connick,* decided in 1983, involved the dismissal of an assistant state prosecutor in New Orleans who served at the pleasure of the District Attorney. When advised of her transfer within the office to a different prosecutorial assignment, which she strongly opposed, the prosecutor prepared and circulated "a questionnaire soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." 461 U.S. at 141, 103 S.Ct. at 1687 (footnote omitted). One of the First Assistant District Attorneys advised the District Attorney that the prosecutor, Myers, was creating a " 'mini-insurrection' within the office." *Id.* The District Attorney terminated Myers's employment for refusal to accept the transfer, for insubordination (distributing the questionnaire), and for creating potential political embarrassment by the question concerning pressures to work in election campaigns. A judgment in favor of Myers for violation of 42 U.S.C. § 1983, which had been affirmed on direct appeal, was reversed by the Supreme Court.

Justice White, writing for the Court in *Connick,* went immediately to the heart of the matter. The district court had "got off on the wrong foot" by finding that the issues presented in the questionnaire were matters of public importance and concern. *Id.* at 143, 103 S.Ct. at 1688. With the exception of the question concerning election campaigns, the questionnaire concerned only internal office matters. *Pickering* 's emphasis on matters of public concern was not accidental. It reflected "both the historical

evolvement of the rights of public employees, and the common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Id.* "In all of [the] cases, the precedents in which *Pickering* is rooted, the invalidated statutes and actions sought to suppress the rights of public employees to participate in public affairs." *Id.* at 144–45, 103 S.Ct. at 1689. The same is true of *Pickering* and of the cases that followed *Pickering*. *Pickering*, "its antecedents, and its progeny" led the Court

> "to conclude that if Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge. When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.
>
> . . . .
>
> "We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. Our responsibility is to insure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the State."

*Id.* at 146–47, 103 S.Ct. at 1690 (footnote and citations omitted).

Solely because of the election campaign question, the Court proceeded to a balancing analysis. Inasmuch as the questionnaire "touched upon matters of public concern in only a most limited sense," and since the survey was "most

accurately characterized as an employee grievance concerning internal office policy," the District Attorney was not required "to tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." *Id.* at 154, 103 S.Ct. at 1693–94.

The third of the principal Supreme Court cases, *Rankin v. McPherson,* involved a clerk in the office of the Constable of Harris County, Texas. The clerk's duties were to enter data concerning the status of civil process into a computer. The clerk had no contact with the public in performing her duties. She was discharged because, when she learned on March 30, 1981, of the attempt to assassinate the President of the United States, she commented to a co-worker, who was also her boyfriend, that, " 'if they go for him again, I hope they get him.' " 483 U.S. at 381, 107 S.Ct. at 2895.

Justice Marshall, speaking for the Court in *Rankin,* restated the balancing test of *Pickering* and, citing *Connick,* said that "[t]he threshold question in applying this balancing test is whether [the clerk's] speech may be 'fairly characterized as constituting speech on a matter of public concern.' " *Id.* at 384, 107 S.Ct. at 2897. The clerk's comment was held to deal with a matter of public concern. News of the attempted assassination had coincided with a conversation between the clerk and her boyfriend concerning the policies of the President's administration. A majority of the Court did not read the clerk's comments as advocating assassination, but as a vehement expression of disagreement with presidential policy.

The clerk in *Rankin* had been dismissed because of the content of her speech. "Given the function of the agency [the clerk's] position in the office, and the nature of her statement, [the Court was] not persuaded that [the constable's] interest in discharging [the clerk] outweighed her rights under the First Amendment." *Id.* at 392, 107 S.Ct. at 2901.

It is the composite of this trilogy, the *Pickering–Connick* rule, that we must apply in resolving Hawkins's contentions.

## II

A literal application of the *Pickering–Connick* rule requires affirmance of the judgment of the Circuit Court for Baltimore City. Here, it is clear that we deal with personal speech—not with a matter of public concern. Under the rule, literally applied, it is the interest of the public employee in speaking on matters of public importance or concern that is protected against termination by the first amendment. Whether the speech which brought about termination of employment relates to a matter of public concern is a threshold question in that analytical model.

Speaking of the effect of *Connick,* Professor Tribe has said:

"Only when a government employee engages in expression addressed to 'matters of public concern' does the first amendment protect him from termination.... The Court has not suggested that speech by public employees on matters not of public concern is 'totally beyond the protection of the First Amendment,' [*Connick,* 461 U.S.] at 147, [103 S.Ct. at 1690,] or that it 'falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction,' *id.,* but the Court clearly views such speech as a form of communication beneath full first amendment protection."

L. Tribe, *American Constitutional Law* § 12–18, at 930–31 n. 15 (2d ed. 1988).

T. Massaro, *Significant Silences: Freedom of Speech in the Public Sector Workplace,* 61 S.Cal.L.Rev. 3, 14 (1987), states that "[i]f the speech does not relate to a matter of public concern, then a federal court will not analyze the reasons for an employer's decision to discipline the worker."

(Footnote omitted). The author states that "[i]n numerous post-*Connick* cases, the lower courts have concluded that the employee speech in question was personal and therefore not protected." 61 S.Cal.L.Rev. at 20 (footnote omitted). The supporting footnote lists, *inter alia,* cases from the First, Third, Fifth, Sixth, Seventh, Ninth, Tenth, Eleventh, and District of Columbia Circuit Courts of Appeal. *Id.* at n. 95.

Clearly, Hawkins was not attempting to stimulate a dialogue on the Holocaust. He was giving vent to his anger, and, relying on his fallible ability to identify persons of Jewish heritage, he used speech as a weapon to abuse the teller who had inconvenienced him. On a literal application of the *Pickering–Connick* rule, the reason given by the Secretary on the initial administrative review of Hawkins's rejection was correct. No balancing is required because the threshold requirement of speech on a matter of public concern has not been met.

## III

Some doubt necessarily remains whether a literal application of the *Pickering–Connick* rule is the appropriate analysis in the instant matter where the speech was away from the job site, outside of business hours, and, in terms, did not discuss or comment upon any aspect of the public employment. Following rejection of the doctrine of unconstitutional conditions in *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), all of the public employee speech cases decided by the Supreme Court have involved speech on, or concerning, the job.[3]

---

**3.** *Keyishian,* in effect, overruled *Adler v. Board of Educ.,* 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952), which had sustained the constitutionality of a statute permitting dismissal from employment in a public school system based solely on membership in an organization deemed to be "subversive." The premise of the *Adler* holding "was that public employment, including academic employment, may be conditioned upon the surrender of constitutional rights which could

Prior decisions of our Court similarly lack an "all fours" factual analogy to the instant matter. Our public employee speech decisions were rendered after *Pickering* and before *Connick*. In *De Bleecker v. Montgomery County*, 292 Md. 498, 438 A.2d 1348 (1982), the chaplain of the Montgomery County Detention Center was discharged after formally accusing one or more guards of brutality toward a prisoner. We described *Pickering* as a case in which the Supreme Court, "[t]o resolve the constitutional claim . . . weighed the interest of the teacher, as a citizen, in commenting on matters of public concern, against the State's interest, as an employer, in providing efficient public service." *Id.* at 507, 438 A.2d at 1353. We had so described *Pickering* in *DiGrazia v. County Executive for Montgomery County*, 288 Md. 437, 449, 418 A.2d 1191, 1198 (1980), a case in which the Chief of Police of Montgomery County was relieved of his duties after stating at a press conference that fifty percent of the department's officers were unqualified and that most members of the force viewed the community as the enemy. In *Brukiewa v. Police Comm'r*, 257 Md. 36, 263 A.2d 210 (1970), we reversed the employment termination of a veteran police officer who, as president of the police officers' union, had appeared on television where he criticized the commissioner's use of radio car patrolling in lieu of foot patrolling. There was no showing that the officer's statements hurt or imperiled the discipline or operation of the police department. In each of these three Maryland decisions the speech dealt with matters of public concern.

Hawkins's argument takes us into territory which has not been mapped by the Supreme Court in its post-*Keyishian* cases. Hawkins denies that the constitutional inquiry ends if there is no matter of public concern. He submits that personal speech which is uttered off the job site and out of working hours and which does not describe the public

---

not be abridged by direct government action." *Keyishian*, 385 U.S. at 605, 87 S.Ct. at 685.

employment, is protected by the first amendment. Consequently, Hawkins argues, the State is prohibited from terminating his employment because of his speech, unless the State can demonstrate that an outweighing detriment to the efficiency of the employment operation results from the speech. This the State has not done, according to Hawkins. Indeed, Hawkins contends that his employment was terminated because of a "heckler's veto," in the sense that the State is punishing him because of the adverse reaction to his speech which was not "politically correct."

The United States Court of Appeals for the Fourth Circuit has observed

"that the 'public concern' or 'community interest' inquiry is better designed—and more concerned—to identify a narrow spectrum of employee speech that is not entitled even to qualified protection than it is to set outer limits on all that is."

*Berger v. Battaglia,* 779 F.2d 992, 998 (1985). *Berger* involved a white Baltimore City police officer, Berger, who, in his free time, entertained in public places by impersonating, complete with blackface, Al Jolson singing the songs of the Jolson era. Certain black citizens of Baltimore, who were offended by the use of blackface makeup, demonstrated at the hotel where Berger was performing. They later complained to the Police Commissioner, who ordered Berger to cease performing in blackface. The Fourth Circuit applied a balancing analysis, as had the district court. The district court had concluded that the interest of the Police Commissioner in good relations with the black community outweighed Berger's interest in performing in blackface. The Fourth Circuit reversed, holding that "this type of off-duty public employee speech has to be accorded the same weight in absolute terms that would be accorded comparable artistic expression by citizens who do not work for the state." *Id.* at 999. "One of the fundamental rights secured by the [first] amendment is that of free, uncensored artistic expression—even on matters trivial, vulgar, or profane."

*Id.* at 1000. The Police Commissioner had not demonstrated a sufficiently weighty, countervailing interest.

Similarly, the United States Court of Appeals for the Tenth Circuit has held that "the public concern test does not apply when public employee nonverbal protected expression does not occur at work and is not about work." *Flanagan v. Munger,* 890 F.2d 1557, 1564 (1989). In *Flanagan* three high ranking officers of the Colorado Springs, Colorado police department had purchased a video rental business, part of the inventory of which consisted of sexually explicit, but not criminally obscene, X-rated films. A citizen complained to the Chief of Police that police officers were engaged in the "porno" business. The Chief of Police ordered the officers to eliminate the X-rated films from their inventory. The court considered that "the *Connick* public concern test is intended to weed out speech by an employee speaking *as* an employee upon matters only of personal interest." *Id.* at 1564. The purpose of the test "is to avoid raising personal personnel grievances to constitutional cases." *Id.* at 1565. For the type of case before it, the court constructed an alternative to *Connick*'s public concern test, namely, "whether the speech involved is 'protected expression.'" *Id.* at 1564. If so, then the court would proceed to a balancing of interests. The court, citing a long line of Supreme Court cases, had no difficulty in concluding that "the distribution of sexually explicit films [has] consistently been upheld as protected under the first amendment." *Id.* at 1565. On the other hand, "[t]he [police] department cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive and for that reason may not cooperate with law enforcement officers in the future." *Id.* at 1566. The balancing favored the employees.

A pre-*Connick* case, *Waters v. Chaffin,* 684 F.2d 833 (11th Cir.1982), is also relevant. The plaintiff-employee, Ezra Waters, was a captain in the Fulton County, Georgia Police Department. One day, by prearrangement, he met Margie Lawrence, a secretary and deputy sheriff in the

department's narcotics division, at a cocktail lounge in Kolb County. Both officers were off duty and in civilian clothes. Waters may have consumed seven drinks in the course of ninety minutes. In conversation with Lawrence he referred to the then Chief of Police as "that son-of-a-bitch," "a bastard," and "nothing but a back stabbing son-of-a-bitch." *Id.* at 834. When Lawrence reported the incident, the Chief of Police did nothing. Nine months later, a successor Chief of Police utilized the incident in attempting to discharge Waters. The court held that Waters's comments were within first amendment protection, because he, "like every citizen, has a strong interest in having the opportunity to speak his mind, free from government censorship or sanction." *Id.* at 837. While the court did "not doubt that the department may restrict the actions of its off-duty officers in many ways, ... it does not follow that these off-duty restrictions may unnecessarily impinge upon private, social conversation." *Id.* at 838 (footnote omitted). Two factors undercut the department's argument that *esprit de corps* was undermined by Waters's comments. First, Waters did not work with the Chief of Police whom he criticized, inasmuch as Waters was on assignment at the time to a state agency. Secondly, the long delay before initiating discipline demonstrated that the comments had no adverse effect.

If we apply the rationale of the above cases, including particularly *Waters*, and hold that Hawkins's comments to Elabd are within first amendment protection, it nevertheless is clear that the comments are near the periphery, and not at the core, of that protection. At one time the Supreme Court said that " '[r]esort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' " *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031, 1035 (1942) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 309–10, 60 S.Ct. 900, 906, 84 L.Ed. 1213, 1221 (1940)). Of course, the reference

to criminal prosecutions for "[r]esort to epithets or personal abuse" must today be read in light of *Rosenfeld v. New Jersey,* 408 U.S. 901, 92 S.Ct. 2479, 33 L.Ed.2d 321 (1972), *Lewis v. City of New Orleans,* 408 U.S. 913, 92 S.Ct. 2499, 33 L.Ed.2d 321 (1972), and *Brown v. Oklahoma,* 408 U.S. 914, 92 S.Ct. 2507, 33 L.Ed.2d 326 (1972) (memorandum decisions with published dissents). *See also Diehl v. State,* 294 Md. 466, 451 A.2d 115 (1982), *cert. denied,* 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 363 (1983). Nevertheless, any first amendment interest against a public employer's considering epithets and personal abuse in decisionmaking about continued employment must be of a very low order. Further, if the public concern test is designed to weed out, in the public employment context, "matters only of personal interest" to the employee, *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690, a similar policy should apply here. Hawkins's uncontrolled urge verbally to abuse Elabd was purely personal, having to do with his own frustrations in attempting to cash the payroll check. For public employment purposes, and excluding from consideration criminal prosecutions, any first amendment protection applicable to Hawkins's invective is not great.

Turning to the employer's interest, the State's apprehension of disruption and possible physical violence at the House of Correction caused by Hawkins's attitude is reasonably based. On our independent review we do not agree with the contention that Hawkins is penalized because his speech was not politically correct, or because he offended Elabd, other firsthand listeners, or those to whom the incident was related. Rather, the evidence supports the conclusion of the Secretary that Hawkins's overreaction and resort to ethnic epithets in the peaceful surroundings of a branch bank, triggered only by the relatively minor irritant of not being able to cash his check as expected, gives foundation to a concern that Hawkins would resort to ethnic or racial abuse if frustrated under the considerable pressures of attempting to maintain order in a penal institution.

In *Connick,* the District Attorney's reasonable belief that his office would be disrupted was sufficient to outweigh the employee's first amendment right to circulate a questionnaire inquiring about pressure brought on employees to participate in political elections. Thus, the warden of the House of Correction need not have waited for an actual eruption precipitated by Hawkins. It is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick,* 461 U.S. at 152, 103 S.Ct. at 1692 (footnote omitted). *See also McMullen v. Carson,* 754 F.2d 936 (11th Cir.1985) (Jacksonville, Florida sheriff need not await actual serious racial conflict before dismissing deputy who appeared on television as member of, and recruiter for, Ku Klux Klan in order to disavow that organization's connection with a specific racial incident in community).

For these reasons, even if a balancing analysis is applied, the Secretary's determination was correct.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT, DONALD H. HAWKINS.

ROBERT M. BELL, Judge, dissenting.

What the petitioner said to the bank teller, the focus of this case, in addition to being politically incorrect, as the petitioner suggests, was uncouth, even despicable, as was his motive for its utterance. The contents of that speech should not be and I suspect, is not, condoned except by those who share the views expressed or who are callous, or barbaric.[1] But, notwithstanding the contents of the speech, the petitioner should not have been dismissed from State employment on that account. I dissent from the majority's holding that his dismissal was proper.

---

1. These remarks refer equally to the bank teller who responded to the petitioner's second jibe with an almost equally uncouth comment.

In affirming the judgment of the Circuit Court for Baltimore City, the majority takes alternative approaches. Using the first approach, notwithstanding its recognition that the facts of the case *sub judice* differ from those in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), from which the appropriate test for assessing the scope of a public employee's first amendment rights in work-related situations has evolved, and *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), which provides a specific application of that test,[2] the majority applies the *Pickering/Connick* test literally. Having thus determined that the speech directed at the bank teller did not involve a "matter of public concern," that it "was not attempting to stimulate a dialogue on the holocaust," 325 Md. at 633, 602 A.2d at 717, it holds that the speech was unprotected by the First Amendment and, consequently, that no balancing test was required.

Alternatively, the majority conducts the balancing test, reaching the same result. Assuming, *arguendo*, that the petitioner's speech was protected by the First Amendment, in the majority's view, it is not entitled to very much protection because it is "near the periphery, and not at the

---

**2.** It has been suggested that this case represents an extension of the *Pickering/Connick* test to a class of cases in which a public employer takes adverse employment action against a public employee for making a statement which is unrelated to employment but is made at work. *Flanagan v. Munger*, 890 F.2d 1557, 1562 (10th Cir.1989). That distinction arguably need not be drawn. Rankin was employed by a law enforcement agency. The argument in support of her dismissal was that, since the office in which Rankin was employed was a law enforcement office, the remark had a very definite effect on the operations of the office. As the dissent put it: "As a law enforcement officer, the Constable obviously has a strong interest in preventing statements by any of his employees approving, or expressing a desire for, serious, violent crimes—regardless of whether the statements actually interfere with office operations at the time they are made or demonstrate character traits that make the speaker unsuitable for law enforcement work." *Rankin v. McPherson*, 483 U.S. 378, 399, 107 S.Ct. 2891, 2904, 97 L.Ed.2d 315, 334 (1987) (Scalia, J., dissenting).

core, of [the first amendment] protection." 325 Md. at 637, 602 A.2d at 720. Then balancing the interests, the majority concludes:

> ... the evidence supports the conclusion of the secretary that Hawkins's overreaction and resort to ethnic epithets in the peaceful surroundings of a branch bank, triggered only by the relatively minor irritant of not being able to cash his check as expected, gives foundation to a concern that Hawkins would resort to ethnic or racial abuse if frustrated under the considerable pressures of attempting to maintain order in a penal institution.

325 Md. at 638, 602 A.2d at 720. Under either approach, the majority is wrong.

The first approach proceeds on a faulty premise: unless the speech is a matter of public concern or community interest, it is not protected, notwithstanding that it occurred away from the job, is not about the job, and, at the time the statements were made, was not spoken by one who could be identified with the job.[3] In other words, from the majority's perspective, it is the speech itself, and only the speech, not the context in which it was uttered, that is important. Until one considers *Pickering/Connick*, and even *Rankin*, in context, the reach of their collective pronouncements cannot be fully appreciated. Those cases were never intended to apply to a situation such as the case *sub judice*. That point was made explicitly and persuasively in *Flanagan v. Munger*, 890 F.2d 1557 (10th Cir.1989).

*Flanagan* involved the propriety of the reprimand by the Chief of Police of three high ranking police officers for their rental of adult, some sexually explicit, but not legally obscene, films, as part of the inventory of a video rental store in which they shared ownership and management. Investigation into the rental of the adult films was prompt-

---

**3.** As the majority points out, the petitioner did display his correctional officer identification to a service representative while attempting to have his check approved for cashing. The offending comments were not made to the service representative and were not prefaced by any remarks associating him with the Department of Correction.

ed by an anonymous letter stating that the officers " 'were co-owners of a Porno Video business.' " 890 F.2d at 1560. Following the written reprimand, the officers filed suit alleging violation of their first amendment rights. The court agreed; however, it declined to apply the *Pickering/Connick* public concern test, finding the fact situation before it to be "factually and conceptually different from the typical *Pickering/Connick* fact pattern." 890 F.2d at 1562. Holding that the case did not involve termination or discipline of a public employee "for critical and allegedly disruptive comments made about work[,]" *id,* (footnote omitted), the court observed:

> [a]lthough the Supreme Court has extended the *Pickering/Connick* test to a case[, *Rankin,*] which involves speech at work but not about work, we do not believe that the *Pickering/Connick* public concern test logically extends two more steps to this case in which a public employee (1) engages in nonverbal protected expression which is (2) neither at work nor about work.

*Id.* Concerning the applicability of the "public concern" test, the court had this to say:

> The formulation of the public concern test in *Connick* and its progeny also implies that the test is not intended to apply to areas in which the employee does not speak at work or about work. "We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690[, 75 L.Ed.2d at 720]. Thus, the *Connick* public concern test is intended to weed out speech by an employee speaking *as* an employee upon matters only of personal interest. The speech of the plaintiffs in this case is clearly not speech as an employee, and thus does not fulfill the purpose of the public concern test. A Fourth

Circuit case makes the point clear. *"Pickering,* its antecedents, and its progeny—particularly *Connick*—make it plain that the 'public concern' ... inquiry is better designed ... to identify a narrow spectrum of employee speech that is not entitled even to qualified protection than it is to set outer limits on all that is." *Berger v. Battaglia,* 779 F.2d 992, 998 (4th Cir.1985). Clearly, plaintiffs are not speaking as employees and thus do not fit the narrow spectrum which the public concern test is meant to identify. (emphasis in original, footnote omitted)

890 F.2d at 1564. The court chose to apply an alternative test, "whether the speech involved is "protected expression," *id.,* which it held, served a similar purpose. This requirement would serve the same purpose as the public concern test, which the plaintiff must satisfy before a court could apply the balancing test.

The *Flanagan* court's rationale applies with equal force to the case *sub judice.* The petitioner's comments to the bank teller were made, not as a correctional officer, a State employee, but as a private citizen. Moreover, in addition to not having been made on the job site, the comments were not about work and, as previously mentioned, were made by one who could not be identified, by the people in the area, by dress or otherwise, with that job site. Therefore, the *Pickering/Connick* line of cases, including *Rankin,* simply does not apply.

The majority position is that, unless any speech by a public employee, whatever the capacity in which it was uttered, no matter where it was uttered, and whether or not it related to the utterer's work, is about, or involves, a matter of "public concern," that public employee may be fired with impunity. In short, under the majority's formulation and interpretation of *Pickering/Connick/Rankin,* a public employee, unlike other members of the public, has no first amendment right except in matters of public concern; if he or she comments on subjects that are not of public concern and word of it gets back to the public employer, the

employee may pay for it with the loss of his or her job.[4] That is not what the *Pickering/Connick* test was designed to accomplish, just the opposite. As the court in *Berger v. Battaglia* put it:

The principle that emerges is that *all* public employee speech that by content is within the general protection of the first amendment is entitled to at least qualified protection against public employer chilling action except that which, realistically viewed, is of purely "personal concern" to the employee—most typically, a private personnel grievance. (Emphasis in original)

779 F.2d 992, 998.

The majority is wrong for another reason: it completely ignores the admonition stated in *Rankin:* "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public function but simply because superiors disagree with the content of employees' speech." 483 U.S. at 384, 107 S.Ct. at 2897, 97 L.Ed.2d at 324. It might be added that vigilance is also necessary to insure that public employers do not silence their employees' discourse because of the heckler's veto, *i.e.* because it is sufficiently politically unpopular or offensive to those who hear it that they importune the public employer to curtail it. *Berger,* 779 F.2d at 1001. Furthermore, the majority's position renders meaningless what I thought was crystal clear: that entitlement to public employment may not be saddled with unreasonable conditions, including a forfeiture of first amendment rights, in lieu of its denial altogether. *See Keyishian v. Board of Regents,* 385 U.S. 589, 605–6, 87 S.Ct. 675, 685, 17 L.Ed.2d 629, 642 (1967).

---

**4.** It is interesting to note that the majority's references, in part II of its opinion, to T. Massaro, *Significant Silences, Freedom of Speech in the Public Sector Workplace,* 61 Cal.L.Rev. 3 (1987) is not supportive of the broad approach the majority takes. The comment on p. 14 of the article was made in the context of a discussion of *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The cases listed in footnote supporting the author's statement on p. 20 involve employee speech, *i.e.* speech about the job or on the job.

If the majority is correct, the ramifications for free speech are devastating and far reaching. Because much, perhaps even most, of the speech that passes between individuals is personal and does not involve matters of public concern, a public employee is in perpetual danger of losing his or her job. Moreover, by the majority's formulation, the public employer may fire the public employee for speech about *any* subject matter, or for use of *any* language that it does not like or feels is inappropriate, leaving the public employee unable to protect him or herself. Thus, a neighborhood argument during which regrettable non-work related comments are made about or to a neighbor, if reported and the employer is so inclined, may be cause for dismissal. So, too, could comments directed at an athlete at a public sporting event be the basis for dismissal. Even intemperate remarks regarding the speaker's prejudices—perhaps, expressing the same sentiments as expressed in the bank, made to a "friend" at the speaker's home—under the majority's view, could be grounds for dismissal if the speaker is a public employee. If overheard by a non-State actor, who reports it, or if reported by the "friend," there is no reason that the public employer could not do what it is now doing, use those remarks as the basis for firing the employee. Because the remarks do not involve matters of public concern, the public employee would have no recourse. Furthermore, under the majority's rationale, not only are public employees limited in their right to express themselves as citizens, even when away from the job and when not speaking about the job, but it does not afford them any way of conforming their speech to the public employers' requirements. This opinion allows the determination of what speech is so offensive as to be cause for dismissal to be made on an ad hoc basis. It provides no standards, except that it cannot involve a matter of public concern, which provides precious little insight into what is actually allowed.

In my opinion, the relevant inquiry, under these facts, is not whether the subject of the speech is a matter of "public

concern," but rather, whether the speech falls within the protection of the first amendment. Unlike the majority, which, rather than attempt to establish that the petitioner's speech does not fall within the first amendment protection, seeks only to discount its value, I believe that, however unpleasant the speech, it is, nevertheless, within the protection of the first amendment. *McMullen v. Carson*, 754 F.2d 936, 940 (11th Cir.1985) (expression of racist views are protected); *Waters v. Chaffin*, 684 F.2d 833, 837 (11th Cir.1982) ("Although the actual words Waters spoke cannot be said to be valuable to the public at large, the first amendment's protections do not turn on the social worth of the statements, save in a few exceptions not relevant here.... Similarly, that Waters chose to express his ideas in language some might find offensive is not, in and of itself, enough to override his interest in speaking freely." (citations omitted)); *Flanagan*, 890 F.2d at 1565. (distribution of sexually explicit, *albeit* non-obscene films). Moreover, "[i]n addition to [a] fundamental interest in speaking as he chooses, [a public employee] has an interest in being free from unnecessary work-related restrictions while off-duty." *Waters*, 684 F.2d at 837. *See also Berger*, 779 F.2d at 998, in which the court concluded, that unless it is a matter of "purely 'personal concern,'" *i.e.*, personal grievance about work conditions, *see Connick*, 461 U.S. at 153–54, 103 S.Ct. at 1693–94, 75 L.Ed.2d at 723–24, to the public employee, the content of all public employees' speech within the general protection of the first amendment is entitled to at least qualified protection against public employer chilling.

Having determined that the petitioner's speech was protected by the first amendment, the speaker's interest, as a citizen, in expressing himself or herself must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35, 20 L.Ed.2d at 817. Contrary to the majority's conclusion, the balancing test in *Pickering/Connick* is

required to be conducted, not simply to be indulged for the purpose of covering all the bases. The balance is not between the *value* [5] of the speech and the State's interest, as the majority holds it is; it is between the right to engage in free speech and the State's interest. *See Flanagan,* 890 F.2d at 1565; *Berger,* 779 F.2d at 999–1000.

Turning to the balancing test, on the petitioner's side is the speech itself and, as indicated, his right to engage in free expression. Relevant factors to be considered on the State's side include "whether the [expression] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899, 97 L.Ed.2d at 327, citing *Pickering,* 391 U.S. at 570–73, 88 S.Ct. at 1736–7, 20 L.Ed.2d at 818–20. In addition to the content of the speech, essential to the balance is the context, including the manner, time and place, in which it was made. *See Connick,* 461 U.S. at 152–53, 103 S.Ct. at 1693, 75 L.Ed.2d at 723–24. Moreover, it is the effect of the speech, itself, on the public employer's enterprise that is most important. *See Pickering,* 391 U.S. at 568–572, 88 S.Ct. at 1734–36, 20 L.Ed.2d at 817–19; *Connick,* 461 U.S. at 150–54, 103 S.Ct. at 1692–94, 75

---

**5.** A rule requiring the content of speech to be valued is fraught with many and, I fear, insurmountable complexities. The most difficult is that the process of valuation is inherently subjective and, thus, aside from the extremes, perhaps, there will be no uniformity; the value of the speech may depend upon which court hears the case. On this point, despite its clear recognition of the movement away from it, I sense that the majority nostalgically yearns for the revitalization of *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). In this regard, awaiting decision by the United States Supreme Court is *R.A.V. v. St. Paul, Minn.,* No. 90–7675, argued December 4, 1991. The issue there is whether an ordinance banning cross burning impermissibly prohibits speech in contravention of the first amendment. Stated differently, the case may provide insight into whether "hate speech" is protected speech.

L.Ed.2d at 722–25; *Flanagan,* 890 F.2d at 1566; *Berger,* 779 F.2d at 1000.

The respondent's argument, which the majority accepts, is that the State reasonably was apprehensive that the "potential" use, by the petitioner, of ethnic epithets on the job "could disrupt," possibly involving physical violence, the petitioner's work site. Significantly, the respondent does not argue, and the majority does not hold, that the petitioner's speech in the bank actually had that effect, or even the tendency to do so. Thus, the State makes no effort to prove that the petitioner's speech affected the actual performance of duty, impaired the harmony among his co-workers, impaired discipline by superiors, had a detrimental impact on the close working relationships for which personal loyalty and confidence are necessary, or, in any way, interfered with the regular operation of the enterprise.

Indeed, because the speech occurred not at work, but in a bank, when the petitioner was off duty and not in uniform and, of course, was not directed at anyone at the work site, it is unlikely that the State could have made such a showing. It relies, instead, on the proclivity, or trait, that uttering these words evidences. Given an appropriate stimulus in the work environment, the majority asserts, that proclivity or trait could result in the utterance of similar insults or intemperate comments there, which, in turn, could disrupt the work site. This focus on a character trait which the bank incident "might suggest" the petitioner has, demonstrates just how attenuated the State's interest in controlling the petitioner's speech is.

It should only be the rare case in which non-employee speech—speech of a public employee that is not about work and does not occur at work, or under circumstances identifying the speaker to bystanders with work—is outweighed by the State's interest in an efficient workplace. In *McMullen,* a recruiter for the Ku Klux Klan, who was also employed in a Sheriff's office, appeared at a news conference called by the Klan to disclaim its involvement in a cross-burning. At that conference, which was broadcast on

the evening news on television, he identified himself as a Sheriff's office employee and "[both] television and newspaper media followed up on [his] status as a Klan recruiter in the Sheriff's office." 754 F.2d at 937. McMullen was fired and the district court upheld the firing. The Court of Appeals affirmed. It reasoned:

Based on an independent and complete review of the record, we hold that the trial court was correct in finding that balancing the rights of the parties required a decision for defendants. The rights plaintiff seeks to exercise are important. We recognize the dangerousness of any principle conditioning employment upon a person's beliefs or association with a constitutionally protected organization. The reaction of the community to such racist views notwithstanding, plaintiff has a constitutionally protected right to express them. The reaction of a community cannot always dictate constitutional protections to employees. We hold only that a law enforcement agency does not violate the First Amendment by discharging an employee whose active participation in an organization with a history of violent activity, which is antithetical to enforcement of the laws by state officers, has become known to the public and created an understandably adverse public reaction that seriously and dangerously threatens to cripple the ability of the law enforcement agency to perform effectively its public duties.

754 F.2d at 940. Although the petitioner is a correctional officer and, in that sense, in law enforcement, he is not as directly involved in law enforcement as was McMullen; although McMullen did not make arrests, his job as a temporary full-time clerk in the records section required him to file public and confidential records, to fingerprint applicants for employment, and to register firearms. Moreover, his comments did not have the same effect, actual or potential, on his job site that McMullen's involvement in the Klan had on his; McMullen's membership in the Klan, due to media coverage, directly affected the Sheriff's office's efficiency and effectiveness, as well as "the very esprit de

corps of the employees and officers." 754 F.2d at 939. So, without endorsing the result in *McMullen* or intimating that it is that rare case, what is obvious is that far greater justification for dismissal existed there than exists here— the effect of McMullen's Klan membership, when disseminated to the public at large, had a very definite impact on the Sheriff's office.[6]

There is yet another reason that the balance does not work out in the State's favor. To reach the conclusion the State reaches, it is necessary to extrapolate from the petitioner's remarks in the bank that the petitioner is prejudiced against, and, therefore, is likely to hurl offensive comments at any and all ethnic groups or is so obnoxious, or insensitive, as to react indiscriminately when aroused. Indeed, the thrust of the State's argument proceeds principally on the latter premise: given appropriate frustrations, the petitioner is likely to "resort to ethnic or racial abuse," directed toward whichever ethnic or racial group he perceives as causing the frustration. The only evidence the State offered in support of that conclusion came, at the first hearing, from the personnel officer at the institution and, at the second, from the Director of Security for the Division of Correction. Neither witness testified as an expert and neither could have. Neither witness, the record reflects, is an expert in human behavior; neither is a psychologist, sociologist or psychiatrist. That testimony was just so much speculation; it was not supported by any data indicating that the conclusions expressed were more likely so than not so. Consequently, in my view, if relevant, the testimony simply did not prove the proposition for which it was

---

**6.** That I use *McMullen v. Carson,* 754 F.2d 936 (11th Cir.1985) to demonstrate the strength that the State's interest must have to overcome the right of a bigot, any bigot, to express his or her views should not be viewed either as an endorsement of the result in that case or an indication that there is a sliding scale for bigotry toleration. All bigotry is vile and none should be condoned. But no bigot should be denied the right to free speech.

offered.[7]

By not introducing, or even attempting to introduce evidence of the effect of the bank speech on the operations of the Department of Correction, in general, or on the institution at which the petitioner worked, in particular, the State acknowledges the lack of impact of that particular speech. If the State were to prevail on the basis of the speculative testimony it presented, it will be enabled significantly to control the speech of its employees; when non-work related speech, which also occurred off the job site, is reported and the State finds it to be inappropriate, it would need to do no more than speculate that that intemperate and unpopular speech may be reflective of a character trait, which, if displayed on the job, "could" pose a risk of job disruption. The State, in short, with impunity, could not only chill, but control, the speech of a significant number of citizens, who work for State government, simply because they work for State government. Those citizens would be rendered effectively without first amendment rights. None of the cases heretofore decided accepts that proposition. Neither do I.

I dissent.

I am authorized by Chief Judge MURPHY and Judge ELDRIDGE to say that they share the views expressed herein.

---

**7.** The best, and most effective, proof of probability that the petitioner will be "frustrated under the considerable pressures of attempting to maintain order in a penal institution" is evidence that he has been so frustrated and did act out as alleged. Such evidence is conspicuous by its absence.