Harold MURRAY, Plaintiff,

v.

W. H. JAMISON and Charlotte, North Carolina, Defendants.

Civ. A. No. 2930.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Dec. 2, 1971.

**1380**

George S. Daly, Jr., Casey & Daly, Charlotte, N. C.; Norman B. Smith, Gen. Counsel, North Carolina Civil Liberties Union, Greensboro, N. C., for plaintiff.

W. A. Watts, Asst. City Atty., Charlotte, N. C., for defendants.

Memorandum of Decision

McMILLAN, District Judge.

### PRELIMINARY STATEMENT

█ The plaintiff was discharged from employment as a switchboard operator or dispatcher by the Building Inspection Department of the City of Charlotte immediately after his supervisors discovered that he was the Grand Dragon of the Ku Klux Klan of North Carolina. Under the circumstances this discharge was unlawful under the First and Fourteenth Amendments to the United States Constitution, and the defendants will be directed to take appropriate remedial action.*

### FINDINGS OF FACT

The plaintiff, Harold R. Murray, is a resident of Charlotte with a less than high school education. He lost both legs at or near the hip to mortar shell fire in the Korean War. He is apparently in his early or middle forties.

In January 1971 he was elected Grand Dragon of the Ku Klux Klan of North Carolina, and a story of this election was prominently carried in a Charlotte newspaper.

On June 21, 1971, Murray was employed to work at the office of the Charlotte Building Inspection Department. He worked until July 9, 1971. His title was dispatcher. He operated the switchboard, connected callers with proper officials and took calls from contractors and relayed them by radio to building inspectors in the field. He received telephone complaints from tenants.

Some of the complaining tenants are black. There is no testimony showing how many nor what proportion of the complainants are black.

Murray did not deal personally with walk-in customers. He only talked with people by radio and telephone. His switchboard and office were in a separate room from the outer office.

Murray performed the job without untoward event and without complaint and in a satisfactory manner until he was discharged on July 9, 1971.

On Friday, July 9, 1971, the defendant Jamison, head of the department, telephoned Murray, who was at home sick, and told him that he was being discharged because of his Ku Klux Klan association.

Apparently, in spite of the newspaper publicity, Jamison had not known that Murray was a Klansman until that day.

Jamison testified that he would not have discharged Murray if he had not been a Klan member.

The discharge was preceded by a July 9, 1971 letter from Jack Bullard, staff director of the Mecklenburg "Community Relations Committee," who met with Jamison on July 9 and wrote Jamison a letter on July 9 saying that plaintiff's effectiveness in dealing with black peo-

---

* Preliminary relief was sought and denied before another trial judge and before a single judge and before a three-judge panel of the Fourth Circuit Court of Appeals. However, the evidence was not fully developed before those judges and no decision on the ultimate merits was made. On October 28, 1971, this court heard all the testimony both sides wanted to present, and these findings of fact and conclusions of law on the merits are based on that testimony.

ple "would be impaired by his Klan connections" and that this would adversely affect the work of the building inspector's office. The theory was that black people would be discouraged from calling the building inspector's office to complain about building defects if they knew that the voice on the phone would be that of the Grand Dragon of the Ku Klux Klan. No such discouraged Negro protesters were brought forward to demonstrate this proposition.

Defendants contend that plaintiff dishonestly withheld from them the fact of his Klan activities by failing to list his Ku Klux membership in a blank in the form reading as follows:

> "Voluntary activities and memberships: List below activities *such as* Boy Scouts, Red Cross, etc., and membership in professional societies, professional registration, etc." (Emphasis added.)

Jamison, plaintiff's immediate supervisor, agreed that this question, fairly read, did not call for disclosure of memberships in political or public opinion bodies such as political parties or the Ku Klux Klan; the contention of dishonest concealment seems to be without factual merit.

Defendants further contend that plaintiff was in a probationary status for six months and without right of job security; but probationers as well as "permanent" employees are entitled to their rights under the Constitution.

■ The court finds that Murray's title as Grand Dragon of the Klan was publicly known when he was employed; that he did not dishonestly conceal this fact; that neither his personal work nor the work of the department as a whole is shown to have been adversely affected by his Klan involvement; that there is no showing that his Klan involvement will adversely affect the future operation or the efficiency of the department; that no "chilling" of complaints from customers is likely to result if the voice on the line is that of a Klan Dragon; that black people with leaky roofs or

plumbing are not shown to be so intolerant as to delay complaining about the landlord simply because the building inspector may have an admitted Ku Klux Klan member on his staff; that the "expert opinion" of Mr. Bullard amounts simply to a naked opinion, unsupported by fact, that both black people and Mr. Murray will be so intolerant of each other that the department can not function efficiently, and that this opinion gave no basis for violating the plaintiff's constitutional rights; that at no time on the job had Murray every carried on any conversation with staff members or the public about Klan activities; that Murray has no criminal record; and that the event which precipitated his discharge was the *discovery* of his Grand Dragonship in the Klan.

The Ku Klux Klan is known and shown by this record to be a segregationist "white supremacy" organization. Its bloody history is well known. Its oath of allegiance requires secrecy; its history is totally repugnant to all who favor constitutional government or who believe that all persons are entitled to due process and to equal protection of laws.

## CONCLUSIONS OF LAW

Klansmen, like Negroes, are people. They are entitled to associate together and to speak their minds. They are not by virtue of Klan membership disqualified from holding public employment any more than is a Presbyterian or a Black Panther or a member of the United Daughters of the Confederacy or of the Daughters of the American Revolution or the American Legion or the NAACP.

If membership in the Klan does prevent adequate performance of public duty it may be cause for discharge or discipline. The objectives of employment are usually fairly well defined, and they do not ordinarily include using the employer's time or the position of the job to further private pursuits. However, in the absence of a showing that Klansmanship has produced or is genuinely likely to produce a lower quality of

performance of the employee's duties, the constitutional rights of free speech and free association and the interests of society in the encouragement of free thought and debate prevent public authorities from discharging public employees merely because of views and associations not approved of by the temporary bearer of the supervisory duty. Constitution of the United States, First and Fourteenth Amendments; Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Battle v. Mulholland, 439 F.2d 321 (5th Cir., 1971).

Plaintiff was wrongfully discharged.