Rudolph **TURBEVILLE**, Plaintiff,

v.

Judge William **ABERNATHY** and the
State of North Carolina,
Defendants.

. Civ. No. 3019.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Nov. 28, 1973.

George S. Daly, Jr., Charlotte, N. C.,
for plaintiff.

Andrew A. Vanore, Jr., Deputy Atty.
Gen., N. C. Dept. of Justice, Raleigh, N.
C., for defendants.

McMILLAN, District Judge.

### PRELIMINARY SUMMARY

Plaintiff, Randolph Turbeville, a
former juvenile counselor of the General
Court of Justice of Mecklenburg County,
North Carolina, sued the defendant, the
Chief District Judge of Mecklenburg
County, alleging that he was wrongfully
discharged by the defendant in November 1971. Plaintiff seeks a declaratory
judgment that his termination was illegal, an injunction commanding his reinstatement with accrued seniority, and
back pay and other relief. The case was
tried without a jury in Charlotte.

### FINDINGS OF FACT

A juvenile counselor is an officer of
the General Court of Justice of North
Carolina. He is appointed by, and
serves at the pleasure of the Chief District Judge. He exercises the statutory
powers of a juvenile probation officer,
including supervising juveniles on probation, acting as a peace officer, bringing juveniles to hearings, making reports and other related matters.

The principal factual question is,
"Why was the plaintiff fired?"

Plaintiff contends that his discharge
was the result of certain public activities, including participating in a demonstration against the Southeast Asian
War (since discontinued, *"cum honore"*),
publicly supporting fair trial for Angela
Davis (since acquitted), exercising the
right of a citizen to criticize bureaucracy
(which adopted his critical suggestions),
and other constitutionally protected activities.

Defendant contends that plaintiff was discharged because of disloyalty evidenced by his public criticism of his superiors in a letter to the Charlotte *Observer*; because of alleged failure to perform his duties; because of having "unauthorized" visitors during working hours; and because on a Sunday afternoon in July, 1971, when he was "on call" but not on duty, the police had to wait a couple of hours before he could be located and could arrive at the police station for counseling with a juvenile.

Plaintiff is a bald and bearded college graduate with a master's degree from Appalachian State Teachers College. He came to work in Mecklenburg County as a juvenile probation counselor on April 1, 1968. He received pay raises annually and by August of 1971 was earning $715 a month. His volume of work was greater than that of some of his fellow counselors and less than that of some of his fellow counselors.

The defendant, formerly an associate judge, became Chief Judge of the seven-man District Court in early 1970.

There were no rules prohibiting outside political or public activity by the counselors.

*The Washington Peace Demonstration.* —In May of 1971, plaintiff went to Washington along with several thousand other people and took part in a demonstration of protest against the Indo-China War. He got leave from his supervisor for the time necessary to make the trip. While in Washington, he was unlawfully arrested along with 2,900 others, and was unlawfully detained for two days in a small jail cell with eleven other political prisoners. He was unable to seek extension of his leave because he was not allowed to use the telephone. He had violated no law, and the courts of the District of Columbia so held, see, Sullivan v. Murphy, 478 F.2d 938 (D.C. Cir.1973). He got back to work a day late and explained to his supervisor what had happened to him, and why he had not been able to make a telephone call to notify his employer of his predicament.

Shortly afterward the defendant called plaintiff and his supervisor in for a conference and engaged in a searching and critical cross-examination of plaintiff, and warned plaintiff to be careful. Plaintiff said he felt "on trial." Defendant said that he was simply trying to find out whether Turbeville had violated any law of the land. He told Turbeville that if he went one step beyond his "constitutional rights," he would be in trouble.

*The Freedom Park Police Encounter.* —On July 4, 1971, plaintiff was in Freedom Park, where a rally had taken place protesting the recent shooting of a "drug pusher" named "Li'l Wolf." Officers Jordan and Carlton and Lieutenant Benfield, after the rally, had some conversation with some of the crowd. Officer R. T. Carlton, on July 9, 1971, made a report which, in pertinent part, read as follows:

". . . At the Princeton Street side of the lake, we stopped, and the demonstrators were persuaded to sit down, and Officer Jordan and myself began to talk to the crowd. Ages ranged from 12 years old to 30 years old. The crowd at that time mainly consisted of people in the ages 12 to 16 years old. Several members of the crowd began asking questions. One of the members of the crowd, a white male, bald, with a heavy beard, directed a question at me. To the best of my knowledge, the question was 'What happens when a policeman observes another police officer commit an act of brutality?' My answer was, that if I saw another police officer commit an act of brutality that I considered illegal, that I would report that incident to my supervisor. He then stated that this method was ineffective and inefficient. This subject was identified as a Mr. Rudolph A. Turbeville, a juvenile court counselor. Lieutenant J. O. Benfield identified this subject to me at the scene.

"I was informed on Wednesday, 7 July 1971, by Captain D. R. Stone, that he had called a Mister Gene Deal and in-

formed him of Mister Turbeville's actions on 4 July 1971."

(Eugene Deal was plaintiff's supervisor.)

*The Matter of the Lateness in Response to the Sunday Off-Duty Telephone Call.*—Ten days later, on Sunday, July 14, 1971, Turbeville was not on duty, but he was "on call," which means that he was subject to being called by the police Youth Bureau if any juvenile should be brought in requiring counseling attention. Turbeville telephoned the office about 12:45 P.M. and reported, as was customary, that he was going to be out for lunch for a while and that he would report in later. He left his home for lunch, then went to Freedom Park. About 2:30, he headed for a telephone to call in again; he asked a policeman for change to make the call; the policeman recognized him and told him to call the Youth Bureau. He went to the police station, dressed informally, met and counseled with the juvenile who was there for attention, and heard nothing more about the incident until it was mentioned by defendant *four months later* in the course of his discharge interview.

Turbeville was not the only counselor who had been temporarily unavailable at his telephone on the day he was "on call."

Mrs. Linda Gail Sloan, Charlotte police officer, testified that on the Sunday afternoon in July 1971 she tried, starting "about 1:30" in the afternoon, to reach Turbeville, who came in, she said, "around 4:00 or 4:30," wearing faded blue jeans and other informal clothing. His appearance caused a problem with the juvenile, she said (it actually turned out that the "problem" was with the *parents* of the juvenile, *not* with the juvenile herself who was also rather informally dressed). She made a report of the event, but defendant did not mention it to Turbeville.

*The Police and State Bureau of Investigation Reports.*—As early as June 1971 the defendant was receiving information from "many Charlotte police of-ficers" who came by and complained about Turbeville. A memo from Lt. J. R. Hall reported to the defendant that Turbeville associated with "a group in Freedom Park who is being policed" for drugs. An earlier report from the State Bureau of Investigation (requested by the defendant on account of the complaints by the Police Department) indicated that Turbeville had attended an anti-war rally in Chapel Hill and planned to attend a similar rally in Washington. The police also communicated to Judge Abernathy that the plaintiff "receives left wing publications at his place of employment." Lt. Hall of the Police Department thought that Turbeville should not be involved in the counseling service and that the State Bureau of Investigation ought to be interested in his activities.

*The Letter to the Charlotte Observer.*—By the spring of 1971, after three years of work, Turbeville and others had become aware of some deficiencies in the procedure by which juvenile cases were handled and scheduled for hearing. Essentially, he and some of his associates believed that the then current practice of allowing the juvenile counselors to dispose of certain juvenile charges informally without a court hearing was not sound practice and, further, that the scheduling of cases ought to be done in a systematic fashion (essentially to fit the convenience and "court days" of the arresting police officer, as is done in the regular criminal courts) so that there might be fewer postponements, quicker disposition of cases, and less inconvenience to parties, witnesses and others involved. According to Turbeville the matter was discussed by the authorities for six months but no action beyond vague promises was taken to put such improvements into effect. According to defendant the higher echelon people in the department were working toward adoption of new procedures and had them about ready to promulgate by mid-October 1971.

In all events, on October 13, 1971, Turbeville wrote a letter to the CHAR-

LOTTE OBSERVER (plaintiff's Exhibit No. 24) reading as follows:

"A significant number of juveniles charged with violations by the police are not being brought to trial. They are supposedly disposed of unofficially. Ideally, this means that the person charged has admitted his guilt to a counselor who then took whatever measures he or she deemed appropriate.

"Even when such proceedings are carried out according to theory, they have certain odious qualities. The proceedings take place in private, where interested parties are often excluded. The injured party, witnesses and police officers may never know what, if any, action was taken. The Court gets a poor image when complainants are not notified to appear, and thus feel that nothing has been done.

"The responsibility for setting cases on the docket is now spread over 18 counselors carrying active caseloads, 2 supervisors and the deputy clerk. So many persons are involved in the setting of a single case that errors consistently occur. Cases may be called where someone didn't notify a certain witness, complainant or police officer, thinking that another person did. Errors caused by the absence of a centralized and systematic method of setting cases on the docket leads (sic) to many continuations that are costly to citizens who must lose another day from work to come to court.

"Specific proposals have been made to the administration to solve these problems, and there are other possible solutions. But no action has been taken since attention was focused on the problem more than 3 months ago.

"The support of interested persons is needed if we are to have a Juvenile Court that serves the people of this community.

[Signed] Randolph Turbeville"

This October 13, 1971, letter was published in the Charlotte Observer five days later, on the following Monday, October 18.

Defendant testified that on Friday, October 15, 1971, he signed a memorandum which essentially put into effect the reforms that the plaintiff and others had been promoting. It had taken time, he said, to make the necessary arrangements and get the necessary concurrences.

If signed on October 15, neither this memorandum nor its content was, in fact, communicated to the plaintiff until *after* his letter was published in the Charlotte Observer.

Defendant and plaintiff's supervisors considered the publication of the letter disloyal and dishonest, they contending that plaintiff knew the substance of the memorandum setting out the changed procedure had been adopted and was about to be promulgated.

Plaintiff says that all that had been received from the "higher ups" was vague promises and that he had not the slightest idea that the October 15 memorandum was going to be put out nor that it was going to be put out at any particular time. (The effective date of the memorandum was stated to be November 1, 1971.)

The court finds as a fact that the plaintiff did not know of, and had no reasonable grounds to suspect the existence or imminence or particulars of the defendant's memorandum when the plaintiff's letter was written or when it was published in the Charlotte Observer.

*Unauthorized Visitors.*—On three occasions during the latter part of his employment in the fall of 1971, plaintiff received visits lasting about five minutes each from two people connected with the "Free Angela Davis" movement. (There was no rule prohibiting counselors from receiving visitors.) One such visit was to pick up a set of car keys and another was to cash a check for the plaintiff.

Plaintiff's own interest in the Angela Davis movement appears to have begun in October of 1971. Plaintiff also got

interested in other public issues then of considerable community controversy involving school discipline and other matters, and his views and associations were reported in newspapers and became known in the community.

*Failure to Perform Official Duties.*— The juvenile court convenes each weekday morning at nine o'clock and hears a dozen or so cases. These cases are listed on a numbered docket. If all necessary persons are ready when a case is called, it will be called in its order for trial. If not all necessary persons are ready, the deputy calling the calendar will pass it over and return to it later. Court never terminates before ten-thirty in the morning and from time to time it does not complete its docket until after lunch.

Some juveniles may be detained at the juvenile center several miles north of town. The juvenile counselors must transport their juveniles to court for these hearings. Normally, though not invariably, all counselors with all their juvenile "clients" are on hand about 9:00 when court opens; there is no rule to that effect; it is just the usual practice and procedure.

Twice in November of 1971, plaintiff was late getting children to court. On one of these occasions he was late because of a scheduled early morning conference (part of his regular duties) with the principal of East High School, which prevented his arriving at court with his juvenile until nine forty-five. On another occasion, on November 16, 1971, because of an oversight, he was an hour late bringing juveniles to court, and did not arrive until about ten o'clock.

Neither of these late arrivals produced any postponement of any hearing or any inconvenience to anyone, so far as the record shows. The cases were all heard on the appointed day.

Turbeville was not the only counselor who had been as much as an hour late in bringing juveniles to court.

On a third occasion in November, plaintiff was assigned to attend a job-related seminar in Gastonia. He made arrangements with his supervisor for the trip and reminded the supervisor that someone would have to cover the cases which he had on the local court docket. A considerable consternation developed in the office that morning, because the secretary who usually keeps the extra keys did not have the extra key to the desk in which Turbeville's files were stored, and it took a little while to open the desk and get access to the files so that someone else could handle the cases. No blame was fixed for the fact that the extra key was missing.

Again, no interruption of the court procedure was caused by Turbeville's authorized absence or by the unanticipated inability to find the desk key.

*The Discharge Conferences.*—On November 23, 1971, plaintiff had his second conference with the defendant. Defendant summoned plaintiff to his office and began to ask questions about various matters. He asked and received explanation about the two occasions when plaintiff had been late for court. He made no inquiry whether court had been delayed or anybody inconvenienced by the fact that plaintiff had not shown up at the same moment as all the other counselors. He questioned the official nature of plaintiff's official business with the principal of East High School. He asked about all of the various matters involving lateness in court and about the confusion (not shown to have been plaintiff's fault) resulting from the misplaced desk key. For the first time, Turbeville received critical questions about the incident of the previous July when he ("on call" but not on duty) had been late getting to the office to interview the juvenile at the Police Station. For the first time he questioned Turbeville's choice of dress on that Sunday afternoon in July.

Ultimately, after running through various criticisms, the defendant indicated that plaintiff had gotten "too enthusiastic about his outside activities" and gave the plaintiff a few days to resign. Turbeville belligerently refused to resign and on November 26, the defend-

ant called him into the office again and discharged him, effective November 30, 1971.

Shortly after the discharge and on the same day, November 26, 1971, the defendant called the Administrative Office of the Courts in Raleigh and advised them that he had a domestic relations counselor who was trying to connect the Angela Davis case with the local school problems and that he, Abernathy, was going to let the counselor go.

 I conclude and find as fact that the primary reason (perhaps not even recognized as such by the defendant Judge Abernathy) for plaintiff's discharge was plaintiff's public exercise of protected First Amendment rights of freedom of speech, of expression and of association. Slightly ahead of the national consensus, plaintiff publicly repudiated the Southeast Asian War; before the jury acquitted Angela Davis, he upheld her right to a fair trial; when bureaucracy was slow about making improvements, he spurred it where it hurt —in the public press—and when he detected lack of alertness by a police officer to protect human safety and dignity, he did not hesitate to speak out about it. He "rocked the boat," and with his beard and abrasive tactics he may be unpleasant to work with; but he had the right not to be discharged because of views and associations which did not happen to suit the temporary bearer of the difficult supervisory duty. Murray v. Jamison, 333 F.Supp. 1379 (W.D.N.C.1971); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Battle v. Mulholland, 439 F.2d 321 (5th Cir. 1971); see Shumate v. Board of Education, 478 F.2d 233 (4th Cir. 1973), and Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) and cases cited.

 As to the critical letter to the editor, on which defendant relies, it is not a valid basis for discharge because it was not "knowingly and recklessly made," Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); New York Times v. Sulli-

van, 376 U.S. 254, 84 S.Ct. 710, 11 L. Ed.2d 686 (1964), and therefore was fair comment on a matter of public interest only indirectly connected with plaintiff's employment.

## CONCLUSIONS OF LAW

Plaintiff was unlawfully discharged in violation of rights protected by the United States Constitution, and is entitled to appropriate relief.

## ORDER

Counsel will confer and tender an appropriate judgment.