Wallace WEICHERDING, Plaintiff,

v.

David A. RIEGEL, Kenneth P. Dobucki, and Howard C. Peters, III, all individually, Defendants.

No. 94–3193.

United States District Court, C.D. Illinois, Springfield Division.

Oct. 30, 1997.

John H. Otto, Champaign, IL, for Plaintiff.

Terence J. Corrigan, Springfield, IL, for Defendants.

## OPINION

RICHARD MILLS, District Judge:

Correctional officer is terminated for his association with the Ku Klux Klan.

Are Defendants entitled to qualified immunity? Yes.

## I. BACKGROUND

Wallace Weicherding ("Weicherding") was employed by the Illinois Department of Corrections ("DOC") for more than 13 years. He worked first as a correctional officer and then as a sergeant at the Graham Correctional Center ("Graham"). In 1992, while employed by the Department of Corrections, Weicherding attended a Ku Klux Klan rally, although he did not actually join the Klan until after his termination from DOC in November 1993.

Weicherding claims that he never talked about the Ku Klux Klan to any staff member at Graham but that during the week of August 12, 1993, he did answer questions initiated by Tom L. Babicky, head of the gang control unit for the Department of Corrections, including giving information that a Ku Klux Klan rally was going to be held in the fall in Greenville or Vandalia. Additionally, Weicherding participated—during non-working hours-in distributing literature to the public to inform them about the goals and ideals of the Ku Klux Klan and inform them that a rally was to be held on September 18, 1993 at his home. Weicherding also appeared on television announcing the September 18 rally.

On or about September 2, 1993, Defendant Kenneth P. Dobucki ("Dobucki"), the Warden of Graham, initiated an investigation of Weicherding by the Investigations Unit of the Department of Corrections. Then, about October 7, 1993, Defendants Howard C. Peters III ("Peters"), the Director of the Department of Corrections, and Warden Dobucki received the investigation report. The report was based on interviews with other correctional officers and concluded that Weicherding attempted to recruit employees of Graham to attend the Ku Klux Klan rally at his residence and distributed pamphlets. It also concluded that Weicherding had openly expressed racial beliefs by stating the phrases "Weiss Macht" (white power), "W.P." or "Wilson Pickett," along with giving Ku Klux Klan hand signals to employees. The report also noted Weicherding's appearance on television when he expressed his association with the Ku Klux Klan and promoted the rally.

On October 22, 1993, Defendant David Riegel, the Assistant Warden, referred Weicherding to the employee review officer for a hearing on the charge that Weicherding violated Department Rule 120.30, which reads:

Individuals shall conduct themselves in a manner which will not reflect unfavorably on the Department, and shall not engage in conduct which is unbecoming or impairs the operations of the Department.

Weicherding was terminated in November 1993.

Other than some comments by inmates, there were no disruptions at Graham because of Weicherding's beliefs. No incident reports were written up about any of the inmates' comments.

Weicherding claims he did not talk about the Ku Klux Klan to any staff at Graham, did not distribute literature at Graham, and did not display any Klan signals to other Klan members. Furthermore, Weicherding claims that no disruption at the prison occurred because of his beliefs.

Weicherding brought this action against Riegel, Dobucki, and Peters claiming that he was terminated in violation of his First Amendment right of association. The Defendants filed a motion for summary judgment claiming they are entitled to qualified immunity.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *see Ruiz–Rivera v. Moyer*, 70 F.3d 498, 500–01 (7th Cir.1995). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987).

## III. ANALYSIS

The doctrine of qualified immunity affords public officials some measure of protection from personal liability in their performance of discretionary duties. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity protects a state official's discretionary actions so long as the official's actions co not violate clearly established rights of which a reasonable person would have known. *Id.* As made clear by the Seventh Circuit, when the issue of qualified immunity is raised, a court must employ a two-part analysis: (1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question? *Burns v. Reed*, 44 F.3d 524, 526–27 (7th Cir.1995).

Plaintiff claims that he was discharged from his employment because of his association with the Ku Klux Klan and that his discharge violated his First Amendment right of association. When a public employee alleges that he was fired in violation of his constitutional right to associate freely with others, the claim is analyzed under the right of free speech cases, *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *See Griffin v. Thomas*, 929 F.2d 1210, 1212–14 (7th Cir.1991) (applying *Connick–Pickering* approach to freedom of association claims). "To be protected, a public employee's expressive activity must 'be on a matter of public concern' and his interest in the expression must outweigh the State's interest in promoting the efficiency of its public services." *Gregorich v. Lund*, 54 F.3d 410, 414 (7th Cir.1995) (quoting *Waters v. Churchill*, 511 U.S. 661, 667–69, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994)).

### 1. *Public Concern*

■ Applying the above principles to the instant case, the Court must first determine whether Plaintiff's expressive activity touched upon a matter of public concern. The determination of whether associational rights touch upon a matter of public concern must be based on "the content, form and context" of the expression as revealed by the whole record. *Gregorich*, 54 F.3d at 415, citing *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690–91. The Court must also examine

"the point" of Plaintiff's expression. *Gregorich,* 54 F.3d at 416.

Reviewing the record, the Court finds that Plaintiff's associational activities do touch upon a matter of public concern. Plaintiff held a Ku Klux Klan rally at his house and distributed Ku Klux Klan literature. Plaintiff's deposition testimony reflects that he perceives the Ku Klux Klan as a "Christian organization" and "fraternal order" comprised mostly of members of the white race. The flyers Weicherding participated in handing out advertising the rally at his house set forth the mission and ideals of the Ku Klux Klan:

> There are thousands of organizations working for the interest of Blacks. How many groups stand up for the culture, values and ideals of the White Majority? Not many, as a result we are faced with reverse discrimination in jobs, promotions, and scholarships—busing for forced integration—high taxes for minority welfare— a high rate of brutal crime—gun control— Anti-White movies and TV programs—in short, a society oriented to the wishes of minorities. We of the Ku Klux Klan are unapologetically committed to the interests, ideas, and cultural values of the White Majority. We are determined to maintain and enrich our cultural and racial heritage.

The Court finds that the message Plaintiff sought to convey and his associational activity touch upon a matter of public concern.

### 2. *Balancing Test*

■ Having determined that Plaintiff's speech involved a matter of public concern, the next step is to "balance the interests of the [employee], as a citizen, in commenting upon matters of public concern and the State's interest, as an employer, in promoting the efficiency of the public services it performs." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35. While it is certainly clear that a public employee has a right to associate, that right is not absolute and it is "subject to the countervailing concerns of governmental interest contemplated by *Pickering* and *Connick.*" *Gregorich,* 54 F.3d at 416. Factors to consider in deciding the extent to which an employer may legitimately take adverse employment action: 1) the effect of the Plain-

tiff's conduct on discipline and harmony among co-workers; 2) whether the employment relationship is one in which personal loyalty and confidence are necessary; 3) whether the speech impeded Plaintiff's ability to competently perform his daily duties; 4) the time, place or manner of the speech; 5) the context in which the underlying dispute arose; 6) whether the matter was one on which debate was vital to informed decisionmaking; and 7) whether the speaker should be regarded as a member of the general public. *Wright v. Illinois Dep't of Children & Family Servs.,* 40 F.3d 1492, 1502 (7th Cir.1994).

■ In the qualified immunity context, this Court must determine whether, at the time Plaintiff was discharged, it was clearly established that his interest outweighed the State's interest. *Gregorich,* 54 F.3d at 416.

Defendant Dobucki submitted an affidavit stating that Graham houses approximately 1,505 male felons. Over 60% are Black or Hispanic; approximately 60% have been convicted of serious violent crimes. Furthermore, while gang activity is prohibited by Department of Corrections' rules, approximately 48% of the inmates housed at Graham are affiliated with a gang. These gangs include the Black Gangster Disciples, Vice Lords, Black Disciples, El Rukns, and Northsiders.

Dobucki's affidavit indicates his belief that the racial composition and violent criminal history of the Illinois prison population have generated racial tensions and a high potential for racially motivated attacks and disturbances. He believes that it is vital to maintain racial harmony. Moreover, it is critical to the safe operation of the correctional facility for the staff to be sensitive to the potential for race violence. Permitting a sergeant who has affiliation with the Ku Klux Klan to continue working would seriously impair security and could lead to incidents of racially motivated violence. Finally, Dobucki was concerned that by permitting a sergeant who was affiliated with the Ku Klux Klan to remain at Graham would create a perception to inmates and staff that the facility condones or supports the philosophy advocated by the Ku Klux Klan and would therefore impair

any perception of fairness by prison administrators, which would exacerbate existing racial tensions and endanger staff and inmates.

Defendants believe they are entitled to qualified immunity because it was not clearly established that the Department of Corrections was powerless to interfere when a correctional officer's private actions raised the potential of interference with the goals of the Department. Additionally, Defendants argue that in every analogous case found, the courts have sided with the employer.

Plaintiff argues that although he could not find a prison case involving the Ku Klux Klan at the Seventh Circuit or Supreme Court level, there are many analogous cases which clearly define Plaintiff's rights.

When it comes to the *Pickering–Connick* balancing test, the Seventh Circuit has noted that:

> [i]t is important to underscore the significance that the latter part of the analysis announced in *Pickering* plays in qualified immunity cases. Differences in the nature of the competing interests from case to case make it difficult for a government official to determine, in the absence of case law that is very closely analogous, whether the balance that he strikes is an appropriate accommodation of the competing individual and governmental interests. We must remember that government officials are not expected to be prescient and are not liable for damages simply because they legitimately but mistakenly believed that the balancing of interests tipped in the State's favor.[citation omitted] . . . . Thus, in such circumstances, " 'the facts of the existing case law must closely correspond to the contested action before the defendant official is subject to liability.' " *Rakovich v. Wade*, 850 F.2d 1180, 1213 (7th Cir.1988) (en banc) (quoting *Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir.)(*Benson II*), cert. denied 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109(1986)). Although the protection afforded the government official is indeed substantial, it is not necessary that the plaintiff produce a case that is on "all fours" with the situation at issue. As the Supreme Court said in *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), a plaintiff must allege the violation of a "suffi-

ciently particularized" right but need not establish that the very action in question has previously been held unlawful. *Gregorich*, 54 F.3d at 414–15.

Plaintiff cannot present a closely analogous case that demonstrates that clearly established law existed demonstrating that Plaintiff's interest in his association with the Ku Klux Klan outweighed the State's interest in maintaining racial harmony in the prison system. The three cases Plaintiff cites as most analogous consist of two district court cases and one state court case. The Seventh Circuit has held that district court decisions "[t]aken together with other evidence ... might show that the law has been clearly established. But by themselves they cannot clearly establish the Law. . . ." *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir.1995). Certainly, if a United States district court case cannot establish "clearly established law," then neither can a state law case. Nonetheless, this Court has examined those cases and does not find them supportive of Plaintiff's claim that the law was clearly established.

Plaintiff first cites *Murray v. Jamison*, 333 F.Supp. 1379 (W.D.N.C.1971), in which the plaintiff, a city employee who worked as a dispatcher for the Charlotte Building Inspection Department, was discharged immediately upon his employer's discovery that he was the Grand Dragon of the Ku Klux Klan of North Carolina. This case did not involve a correctional officer or a person even remotely employed in a similar capacity. Because the occupations are different, the balancing test would be different. In fact, the case itself recognizes that the result may be different if membership in the Klan produced or could produce a "lower quality of performance of the employee's duties." *Id.* at 1381–82.

The second alleged analogous case cited by Plaintiff, *Savina v. Gebhart*, 497 F.Supp. 65 (D.Md.1980), involved a school night watchman and applied pre-*Harlow* qualified immunity standards. Therefore, it is of no help to Plaintiff.

The third case cited by Plaintiff, *Curle v. Ward*, 46 N.Y.2d 1049, 416 N.Y.S.2d 549, 389 N.E.2d 1070 (1979), is certainly the most

1148

analogous. In that case, a correctional officer was terminated for his alleged membership in the Ku Klux Klan. The Court of Appeals of New York, in a two paragraph. opinion, held that the defendants failed to tender sufficient evidence of the claimed detrimental impact on the operation of the correctional facility. A state court case is certainly not the proper source for "clearly established law." Therefore, this decision is of no help to Plaintiff. Furthermore, this Court finds the dissent of that case more persuasive. As the dissent in that case points out, "common sense is proof enough of the effect prison guards who are members of the Klan would have on a prison population comprised mainly of Blacks and hispanics." *Id.* at 1051, 416 N.Y.S.2d 549, 389 N.E.2d 1070 (Wachtler, J. dissenting).

Consequently, the Court finds ample support for Defendants' conclusion that the balancing of interests would weigh in their favor. The case of *McMullen v. Carson,* 754 F.2d 936 (11th Cir.1985), involved a clerical employee for the Sheriff's department. After an incident in the town involving a cross left in the yard of a black woman's home, the plaintiff and the "Imperial Wizard" of the Klan faction to which they belonged, held a news conference disclaiming involvement in the incident. *Id.* at 937. During that televised news conference, plaintiff identified himself as a Klan recruiter and a Sheriff's office employee. After the Sheriff learned of plaintiff's activities, he dismissed him. The Sheriff testified that he thought retaining the plaintiff would lead to morale problems and affect his department's ability to perform its duties. *Id.* After balancing the competing interests, the Court found that the interests balanced in favor of the defendants. *Id.* at 940. *See also Tindle v. Caudell,* 56 F.3d 966 (8th Cir.1995) (finding that a police officer's interest in attending a party dressed in blackface did not outweigh the police department's interest; "[b]ecause police departments function as paramilitary organizations charged with maintaining public safety and order, they are given more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer." *Id.*· at 971, (citations omitted)). *Lawrenz v. James,* 852 F.Supp. 986 (M.D.Fla.1994), *aff'd* 46 F.3d 70 (11th Cir.

1995) (holding that correctional institution defendant's interest in the efficient operation of the correctional facility outweighed plaintiff's First Amendment right to wear, off-duty, a T-shirt adorned with a swastika and the words "White Power.").

Plaintiff tries to distinguish the cases cited by Defendants arguing that no negative reactions occurred as a result of Plaintiff's Klan membership nor after he appeared on television stating that the Klan rally would be held at his house. Therefore, unlike *McMullen,* where the violent reaction of the community affected the balancing test, the balancing test in the instant case would not necessarily tip in favor of Defendants.

The Court finds this argument unavailing. There is no requirement that the Defendants wait for "events to unfold to the extent that the disruption of the office and the destruction of working relationships [was] manifest" before acting. *Connick,* 461 U.S. at 152, 103 S.Ct. at 1692. *See also Lawrenz v. James,* 852 F.Supp. at 994 (holding that defendants "did not have to wait until racial tensions erupted before taking action.").

It is well-accepted that the Ku Klux Klan is not merely, as Plaintiff stated, a "fraternal, Christian organization." As noted by the Eleventh Circuit, "violent racism" is the "Klan's hallmark." *McMullen,* 754 F.2d at 938. Correctional facilities and their officers have a responsibility to operate the correctional facility in a safe manner—safe for inmates and safe for staff. As Dobucki's affidavit suggests, it is critical that staff be sensitive to the potential for race violence. Plaintiff's affiliation with the Klan could lead to racial tension aid incite violence—and Defendants were not required to wait until such violence resulted before taking action. Furthermore, the perception by the inmates and the community regarding the philosophy of the correctional facility is crucial. Permitting a sergeant affiliated with the Klan to remain at Graham could send the message that the facility condones or even supports the philosophy of the Klan This could further exacerbate racial tensions in the prison and in the community.

The Court finds that it was not clearly established that Plaintiff's interest out-

weighed the State's interest. In fact, the case law clearly supports Defendants' conclusion that their interests would outweigh Plaintiff's interest.

## IV. CONCLUSION

For the foregoing reasons, the Court finds Defendants are entitled to qualified immunity. Summary judgment is granted to Defendants.