[694 NYS2d 170]

In the Matter of the Arbitration between NEW YORK STATE LAW ENFORCEMENT OFFICERS UNION, COUNCIL 82, AFSCME, AFL-CIO, et al., Respondents, and STATE OF NEW YORK et al., Appellants.

Third Department, April 29, 1999

## APPEARANCES OF COUNSEL

*Eliot Spitzer, Attorney General,* Albany (*Denise A. Hartman* of counsel), for appellants.

*Hite & Casey,* Albany (*Lise Gelernter* of counsel), for respondents.

## OPINION OF THE COURT

CREW III, J.

Petitioner Edward Kuhnel, a correction officer employed by respondent Department of Correctional Services (hereinafter DOCS) at Eastern Correctional Facility in Ulster County, was suspended without pay on December 12, 1996 for flying a Nazi flag from the front porch of his home in the Town of Marbletown, Ulster County. The notice of discipline charged Kuhnel with violating those sections of the employee manual providing that "[n]o employee, whether on or off duty, shall so comport himself as to reflect discredit upon the Department or [i]ts personnel" and, further, directing that "[a]n employee shall not join or otherwise affiliate himself with any organization, body, or group of persons when such association or affiliation will place his personal interest or interest as a member of such group in conflict with or otherwise interfere with the impartial and effective performance of his duties as an employee". The notice of discipline advised Kuhnel that "[b]y the display of this racist symbol you have brought discredit to [DOCS] and your fellow employees. In addition your actions have endangered the safety and security of all facilities in [DOCS]".

Pursuant to the grievance procedure outlined in the collective bargaining agreement between petitioner New York State Law Enforcement Officers Union, Council 82, AFSCME, AFL-CIO and respondent State of New York, Kuhnel's suspension was submitted to arbitration. In an opinion dated June 20, 1997, the arbitrator found that while the State had probable cause to suspend Kuhnel pursuant to the collective bargaining agreement, he was not guilty of the charges contained in the notice of discipline and, accordingly, the arbitrator ordered

that Kuhnel be reinstated to his position with full back pay and benefits. Thereafter, petitioners commenced this CPLR article 75 proceeding to confirm the award, and respondents cross-petitioned to vacate the award upon the ground that it was irrational and violative of public policy. Supreme Court granted petitioners' application and denied the cross petition, prompting this appeal by respondents.

As a starting point, we find no merit to respondents' contention that the arbitrator's award is totally irrational. Given the factual findings that Kuhnel's conduct neither harmed DOCS' business, adversely affected Kuhnel's ability to perform his job[1] nor led other employees to refuse to work, we cannot conclude that the award was totally irrational. That being the case, our inquiry distills to whether the underlying arbitration or the award resulting therefrom was violative of a strong public policy (*see, e.g., Matter of Town of Callicoon [Civil Serv. Empls. Assn., Inc., Town of Callicoon Unit]*, 70 NY2d 907, 909).

To answer such inquiry in the affirmative, this Court "must be able to examine [the] arbitration agreement or [the] award on its face, without engaging in extended factfinding or legal analysis, and conclude that public policy precludes its enforcement" (*Matter of Sprinzen [Nomberg]*, 46 NY2d 623, 631). Stated another way, vacatur of the underlying award requires this court to conclude that the agreement or the award itself "directly conflicts with * * * a strong public policy ' "amounting to gross illegality or its equivalent", generally to be found in a "readily identifiable source in the statutes or common-law principles" ' " (*Matter of Fallon [Greater Johnstown School Dist.]*, 118 AD2d 936, 937, *lv denied* 68 NY2d 603, quoting *Matter of Board of Educ. [McGinnis]*, 100 AD2d 330, 333, quoting *Matter of Port Washington Union Free School Dist. v Port Washington Teachers Assn.*, 45 NY2d 411, 422 [Breitel, Ch. J., concurring]). As "arguably every controversy has at its core some issue requiring the application, or weighing, of policy considerations", we must take care to exercise due restraint and avoid, under the guise of public policy, invading the province of the arbitrator and resolving the underlying dispute on the merits (*Matter of Sprinzen [Nomberg]*, supra, at 630, 633).

Applying these principles to the matter before us, we are of the view that respondents have failed to demonstrate either

---

1. Notably, all of Kuhnel's job evaluations since 1981, with the exception of the 1984-1985 evaluation, were either excellent or outstanding.

that the disciplinary charges brought against Kuhnel were not properly the subject of arbitration or that the public policy of this State, as embodied in a readily identifiable source in our statutes or decisional law, prohibits, in an absolute sense, the presence within our prison system of those that display the Nazi flag, or any other flag that may be seen as symbolizing bigotry, racism or totalitarianism. Accordingly, we are constrained to affirm.

Initially, there does not appear to be any dispute that the underlying disciplinary grievance was the proper subject of arbitration. The collective bargaining agreement provides that arbitration is the exclusive procedure for resolving disciplinary matters and makes clear, pursuant to section 8.2 (h), that "[t]he disciplinary arbitrator's decision with respect to guilt or innocence, penalty, or probable cause for suspension * * * shall be final and binding upon the parties". As to the relief awarded here, reinstatement with back pay is expressly authorized under the parties' agreement. Nor are we persuaded, for the reasons that follow, that a disciplinary proceeding brought by an administrative agency against a public employee who speaks on a matter of public concern involves the type of determination that, due to the existence of a strong public policy, must be resolved in a judicial forum (compare, Matter of Fallon [Greater Johnstown School Dist.], supra). Accordingly, we find no basis upon which to conclude that the underlying arbitration agreement—on its face—violates public policy.

Turning to the propriety of the award itself, which directs that Kuhnel be reinstated to his former position as a correction officer with full back pay and benefits, we understand respondents' reluctance to return a purported racist to his former employment within the prison system. However, Kuhnel's conduct, offensive as it may be, is not, standing alone, sufficient to sustain respondents' asserted public policy violation. Simply stated, none of the authorities cited by respondents demonstrate that the statutory or decisional law of this State precludes, in an absolute sense, the presence within our prison system of those who embrace bigoted views as evidenced by their public speech. Indeed, to adopt such a policy would, in our view, run counter to the principles enunciated in Waters v Churchill (511 US 661) and Jeffries v Harleston (52 F3d 9, cert denied 516 US 862), which instruct that a restriction upon an employee's speech can be justified only where the employer can show that its interest in effectively performing a public service outweighs the employee's 1st Amendment right to comment

upon a matter of public concern. To that end, although the employer need not demonstrate actual disruption of the work place, it must establish a reasonable prediction thereof.[2]

Here, after performing just such a balancing test, the arbitrator specifically found that DOCS had failed to factually demonstrate any actual harm to its business and, further, that its prediction of disruption was unfounded and, in some instances, entirely speculative. In urging this Court to reach a contrary conclusion, respondents and our dissenting colleagues would have us do precisely what the Court of Appeals has instructed us not to do—namely, invoke public policy considerations as a basis for usurping the role of the arbitrator and resolving the underlying dispute on the merits. Even accepting, as the dissent posits, that the public policy of this State prohibits the employment of an alleged racist within its prison system, one simply cannot apply the balancing test set forth in *Waters v Churchill* (*supra*) and *Jeffries v Harleston* (*supra*) and reach the result urged by respondents and the dissent without invading the province of the arbitrator and weighing and evaluating the evidence placed before him. As it is not the function of this Court to "second-guess" the factual findings made or legal conclusions reached by the arbitrator (*Matter of Sprinzen [Nomberg], supra*, at 632), we have little choice but to affirm Supreme Court's order confirming the arbitrator's award.

PETERS, J. (dissenting). We believe that there exists a strong public policy in this State, as embodied in a readily identifiable source, which prohibits employment within our prison system of an avowed racist. We first acknowledge that in most situations, petitioner Edward Kuhnel's public display of the Nazi flag, while patently offensive, would have been wholly within his constitutional rights. However, as Justice Holmes opined, "the character of every act depends upon the circumstances in which it is done * * *. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic" (*Schenck v United States*, 249 US 47, 52 [citation omitted]). In this confrontation between the public policy concerns of the State regarding prison security as reflected, *inter alia*, in the employee manual and Kuhnel's 1st Amendment interests in conduct engaged in outside of a work

---

2. Indeed, we have had occasion to apply such a balancing test when dealing with the constitutional right of freedom of association (*see, Curle v Ward*, 59 AD2d 286, *mod* 46 NY2d 1049 [correction officer suspected of membership in Ku Klux Klan could not be dismissed from employment absent proof that such membership threatened the State's interest]).

setting, we are convinced that the State must prevail. "Controversies involving questions of public policy can rarely, if ever, be resolved by the blind application of sedentary legal principles. The very nature of the concept of public policy itself militates against any attempt to define its ingredients in a manner which would allow one to become complacent in the thought that those precepts which society so steadfastly embraces today will continue to serve as the foundation upon which society will function tomorrow. Public policy, like society, is continually evolving and those entrusted with its implementation must respond to its everchanging demands" (*Matter of Sprinzen [Nomberg]*, 46 NY2d 623, 628).

Prison has been characterized as a "netherworld" (*Matter of Seelig v Koehler*, 76 NY2d 87, 93, *cert denied* 498 US 847) wherein correction officers interact on a constant basis "with the most dangerous of society's concentrated mass in the confines of their walled symbiotic universe" (*id.*, at 95). "Tension between them is unremitting. Frustration, resentment, and despair are commonplace" (*Wolff v McDonnell*, 418 US 539, 562). Hence, the preeminent role of prisons becomes the supervision of these inmates (*see, People ex rel. Vega v Smith*, 66 NY2d 130, 142) with the implementation of discipline through, *inter alia*, the issuance of misbehavior reports upon a correction officer's observance of an infraction of the regulations of respondent Department of Correctional Services. Because correction officers play a significant role in the prison disciplinary process, we disagree with the majority and conclude that the safe operation of a correctional facility mandates that its employees be race neutral and sensitive to the volatility of the environment which can only breed intolerance.* Even the perception by inmates that prison authorities condone or support a racist philosophy "could further exacerbate racial tensions in the prison and in the community" (*Weicherding v Riegel*, 981 F Supp 1143, 1148, *affd* 160 F3d 1139).

The facts here are compelling. Unlike the correction officer in *Curle v Ward* (59 AD2d 286, *mod* 46 NY2d 1049) who was only suspected of having membership in a racist organization, Kuhnel publicly proclaimed his allegiance to racist doctrine by his unfurling of the Nazi flag on more than one occasion. This act

---

* Notably, Kuhnel had previously been disciplined in 1988 for allegedly belonging to a white supremacist organization. In that proceeding, the arbitrator dismissed the charges and reinstated Kuhnel with full back pay and benefits.

generated substantial publicity, having been reported in the Times Herald Record in the City of Middletown, Orange County, whose readership area encompasses Eastern Correctional Facility, as well as in newspapers from Rome, Albany, Troy, Schenectady and New York City. Noting that Eastern Correctional Facility is a maximum security prison wherein the ethnic distribution is 50% African-American, 30% Hispanic and 20% Caucasian, the arbitrator found Kuhnel to be sympathetic to Nazi or neo-Nazi propaganda, rendering the flying of such flag to be his personal statement and identification with "the repugnant and racist symbol of Nazi Germany". Nonetheless, he concluded that the Department had failed to show actual or inevitable harm to its operations or reputation and determined that "affiliation" with the neo-Nazi party could not be based solely upon the display of the flag and the majority of this Court has agreed.

It is axiomatic that "[s]ymbolism is a primitive but effective way of communicating ideas. The use of * * * [a] flag to symbolize some system, idea, institution * * * is a short cut from mind to mind" (*Board of Educ. v Barnette*, 319 US 624, 632). Hence, "[t]he message conveyed by some flags—the swastika, for example—may survive long after it has outlived its usefulness as a symbol of regimented unity in a particular nation" (*Texas v Johnson*, 491 US 397, 436 [Stevens, J., dissenting]). In our view, the underlying award must be deemed violative of a strong public policy reflected in readily identifiable sources, to wit, the employee manual, which proscribes the presence within our prison system of those who affiliate with racist groups, and by common-law principles since the mere presence of such employees in these "paramilitary organizations charged with maintaining public safety and order" (*Tindle v Caudell*, 56 F3d 966, 971) undermines the security of such system and denigrates public confidence therein (*see, id.*; *see also, Lawrenz v James*, 852 F Supp 986, *affd* 46 F3d 70; *Matter of Morrisette v Dilworth*, 59 NY2d 449).

Recognizing that the matter at issue raises important 1st Amendment concerns, it must be emphasized that those who choose to be employed in a paramilitary setting "voluntarily sacrifice certain cherished freedoms" (*Matter of Seelig v Koehler*, 76 NY2d 87, 96, *supra*; *see, Spetalieri v Kavanaugh*, 36 F Supp 2d 92; *Heil v Santoro*, 147 F3d 103, 109; *see also, Connick v Myers*, 461 US 138) when their exercise interferes with the government employer's functions (*see, Waters v Churchill*, 511 US 661, 671-675). As the United States Supreme Court stated:

"Government agencies are charged * * * with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that [he] will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain [him]" (*id.*, at 674-675). Notably, such restraint has not been limited to conduct occurring in the workplace (*see, Spetalieri v Kavanaugh, supra* [police officer not engaged in protected speech when making racially biased statement on private cell phone while off duty]; *Weicherding v Riegel, supra* [correction officer's employment terminated due to his participation, during nonworking hours, in Ku Klux Klan activities]; *Lawrenz v James, supra* [correction officer terminated for wearing a T-shirt, off duty, which was adorned with a swastika and the words "white power"]).

During the 15 years between the Court of Appeals determination in *Matter of Curle v Ward* (46 NY2d 1049, *supra*) and the United States Supreme Court's determination in *Waters v Churchill* (*supra*), the government's interest in achieving its goals as effectively as possible has evolved from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer in those situations where the employee exercises a right to comment on matters of public concern. "[A] government employer [may] fire an employee for speaking on a matter of public concern if: (1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech" (*Jeffries v Harleston*, 52 F3d 9, 13; *see, Waters v Churchill, supra*).

Despite the limited record presented here, "[t]he * * * controversial character of [the] statement" (*Rankin v McPherson*, 483 US 378, 387) is apparent. We conclude, as a matter of law, that in viewing the "content, form, and context" (*Connick v Myers*, 461 US 138, 147-148) of Kuhnel's statement, it addressed a matter of public concern and that his right to freedom of expression must therefore be balanced against the government's interest as an employer to provide public services effectively and efficiently (*see, Connick v Myers, supra; Pickering v Board of Educ.*, 391 US 563, 568). "[T]he closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it may be punished" (*Jeffries v Harleston, supra*, at 13).

Acknowledging that the potential for disruptiveness, or a reasonable prediction thereof, is now enough to outweigh the value of the speech so long as the employer took action against the employee based upon this disruption and not because of the content (*see, Waters v Churchill, supra,* at 673), we believe that the State's prediction of disruption by the "communicative impact" (*United States v Eichman,* 496 US 310, 317) that the public display of the Nazi flag has when flown by one of its correction officers, coupled with the publication thereof through newspaper accounts, was eminently reasonable and entitled to "substantial weight" (*Waters v Churchill, supra,* at 673). Since correction officers exercise control over the inmate population, the potential for disruption, reflected in the prohibition of Kuhnel's conduct by the employee manual, must be deemed to outweigh his 1st Amendment rights due to the primary interest of the State, as an employer, to provide requisite services in a safe and efficient manner.

New York must be permitted to effectively quell the excrescences of racist correction officers employed within the confines of our prison system in furtherance of a strong public policy which seeks to insure public confidence in a disciplinary system which relies almost exclusively upon the assessment of the conduct of its prison population by correction officers like Kuhnel. There exists no basis to "wait until racial tensions erupt[ ] before taking action" (*Lawrenz v James,* 852 F Supp 986, 994, *supra; accord, Weicherding v Riegel,* 981 F Supp 1143, 1148, *supra*). "In light of the deleterious effects of allowing militant white supremacists to stand guard over the safety and welfare of racial minorities, it would be ironic if, in the name of freedom of [speech], we sanction the subversion of law and order that subjects mainly [African] Americans to the exact same abuses of racially motivated violence that made development of the doctrine worthwhile." (*Blue by Day and White by (K)night: Regulating the Political Affiliations of Law Enforcement and Military Personnel,* 81 Iowa L Rev 1079, 1169 [May 1996].)

We would therefore reverse Supreme Court's order and vacate the arbitration award.

MIKOLL, J. P., and MERCURE, J., concur with CREW III, J.; PETERS and CARPINELLO, JJ., dissent in a separate opinion by PETERS, J.

Ordered that the order is affirmed, without costs.